**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

THOMAS K. WELCH and DAVID R.
JOHNSON,

    Defendants-Appellees.

Nos. 01-4170
01-4241

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:00-CR-324-S)**

---

Richard A. Friedman, Attorney, Appellate Section (John C. Keeney, Acting Assistant
Attorney General, Richard N. Wiedis, Senior Trial Attorney, Fraud Section, and
John W. Scott, Senior Trial Attorney, Public Integrity Section, with him on the
brief), Criminal Division, United States Department of Justice, Washington, D.C.,
for Plaintiff-Appellant.

William W. Taylor III, Zuckerman Spaeder LLP, (Blair G. Brown, Elizabeth
Taylor, and Amit P. Mehta, Zuckerman Spaeder LLP, Washington, D.C., and Michael
Goldsmith, Park City, Utah, for Defendant-Appellee Thomas K. Welch, and Max D.
Wheeler, Camille N. Johnson, and Robert J. Shelby, Snow, Christensen & Martineau,
Salt Lake City, Utah, for Defendant-Appellee David R. Johnson, with him on the brief),
Washington, D.C., for Defendants-Appellees.

---

Before **KELLY**, **BALDOCK**, and **HENRY**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

Defendants Thomas K. Welch and David R. Johnson were the President and Senior Vice President, respectively, of the Salt Lake City Bid Committee for the 2002 Olympic Winter Games (SLBC). Community leaders organized the SLBC in the late 1980's as an I.R.C. § 501(c)(3) not-for-profit corporation under the direction of a board of trustees. The SLBC's primary purpose was to secure, in cooperation with the United States Olympic Committee (USOC), the right from the International Olympic Committee (IOC) to host the quadrennial Winter Games in Utah.[1] The IOC is an "international non-governmental non-profit organization" based in Lausanne, Switzerland. One of the primary duties of individual IOC members from participating countries is to cast votes to elect the host city for the Olympic Games.[2] In June 1995, the IOC awarded the 2002 Olympic Winter Games to Salt Lake City, Utah.[3]

---

[1] Among other reasons, Congress established the USOC as a not-for-profit corporation to represent the United States in its relations with the IOC. See 36 U.S.C. § 220505(c)(2). The USOC is authorized to select from among candidate cities in the United States the city that will compete against cities in other countries for the right to host the Olympic Games. See id. § 220503(3).

[2] The IOC consists of three organs: the Session, the Executive Board, and the President. The Session, which is a general meeting of all IOC members, is the "supreme organ of the IOC;" its decisions are final. Although the Session is the "supreme organ," the authority to manage the affairs of the IOC is vested in the Executive Board, which consists of the President, four Vice-Presidents and six additional members, all of whom the Session elects. The majority vote of all IOC members, i.e., the Session, determines the host city for the Olympic Games.

[3] Thereafter, the SLBC renamed itself the Salt Lake City Organizing Committee for the 2002 Winter Olympic Games. Defendant Welch continued as President until August 1997, while Defendant Johnson continued as Senior Vice President until January

(continued...)

2

In July 2000, a federal grand jury indicted Defendants Welch and Johnson on fifteen bribery-related counts of criminal misconduct in connection with the SLBC's activities in procuring the 2002 Games. Count I of the indictment charged Defendants with conspiracy to defraud the United States by committing numerous bribery-related offenses in violation of 18 U.S.C. § 371. Counts II through V charged Defendants with use of communications in interstate and foreign commerce to facilitate unlawful activity in violation of 18 U.S.C. § 1952(a)(3). Counts VI through X charged Defendants with mail fraud in violation of 18 U.S.C. § 1341. Lastly, Counts XI through XV charged Defendants with wire fraud in violation of 18 U.S.C. § 1343. Upon Defendants' motion and over a magistrate judge's contrary recommendations, the district court dismissed the indictment in its entirety. The Government appeals. We exercise jurisdiction pursuant to 18 U.S.C. § 3731. We reverse and remand.

I.

According to the indictment, Salt Lake City began competing for the Olympic Winter Games around 1988. In 1994, the SLBC and USOC jointly executed and filed with the IOC an "Undertaking" in which they agreed to abide by the provisions of the International Olympic Charter and to act in accord with the IOC's instructions to

---

[3](...continued)
1999. We refer to both corporate entities as the SLBC.

candidate cities bidding on the 2002 Winter Games. As part of the 2002 bidding process, the IOC distributed a series of instructions to candidate cities and IOC members. IOC members similarly are bound by the Charter and take an oath to remain free from commercial influence. As stated in the indictment, the instructions "limited certain expenditures by candidate cities, created rules concerning visits by IOC members to candidate cities, and placed limitations on the value of gifts and other benefits which could be given to IOC members by and on behalf of candidate cities."

Meanwhile, between February 1988 and July 1999, Defendants purportedly utilized interstate facilities, contrary to federal law, to engage in a bribery scheme to "misappropriate and misapply the monies and funds of the SLBC[] by diverting SLBC income and by giving . . . money and other material benefits to influence IOC members to vote for Salt Lake City to host the Olympic Winter Games[.]" Among other things, the indictment alleges Defendants instructed an SLBC "sponsor" "to make a series of payments to the defendants in cash so that the payments would not appear on the SLBC's books and records and could be diverted by the defendants for their own personal purposes."

The indictment alleges Defendants (1) made direct and indirect payments of money and other things of substantial value to IOC members; (2) paid for tuition, living expenses, and spending money for the children and relatives of IOC members; (3) paid for medical expenses of IOC members and their relatives; and (4) paid for personal

4

and vacation travel expenses of IOC members and their relatives. Defendants also purportedly obtained lawful permanent resident alien status for an IOC member's son through submission of false and misleading documents to immigration authorities. Defendants allegedly conferred valuable benefits upon amenable IOC members totaling approximately $1,000,000 in value.[4]

According to the indictment, neither the SLBC, its board of trustees, nor its contributors were aware of Defendants' scheme. Similarly, neither the USOC, IOC, Salt Lake City, State of Utah, nor the United States had any knowledge of Defendants' activities. The indictment alleges Defendants secretly retained and paid Alfredo La Mont, the USOC's Director of International Relations, to assist them "in influencing the conduct of IOC members in connection with the IOC's election" of Salt Lake City to host the Winter Games. To further conceal their illicit activities, Defendants allegedly (1) made payments to IOC members in cash; (2) created and funded a sham program known as the National Olympic Committee Program ostensibly

---

[4] According to the indictment, foreign "consultants" to Defendants identified the amenable IOC members. The alleged payments and benefits to IOC members included: (1) $320,000 to Jean Claude Ganga of the Congo; (2) $91,000 to Bashir Attarabulsi of Libya; (3) $42,000 to Charles Mukora of Kenya; (4) $20,000 to Zen Gadir of the Sudan; (5) $78,000 to Un Yong Kim of South Korea; (6) $195,000 to Rene Essomba of Cameroon; (7) $3,000 to Austin Sealy of Barbados; (8) $30,000 to Augustin Arroyo of Ecuador; (9) $1,200 to Slobodan Filopovic of Yugoslavia; (10) $99,000 to David Sibandze of Swaziland; (11) $107,000 to Lamine Keita of Mali; (12) $33,750 to Pirjo Haggman of Finland; (13) $8,000 to Guirandou N'Daiye of the Ivory Coast; (14) $5,000 to Anton Geesink of the Netherlands; and (15) $20,000 to Sergio Santander-Fantini of Chile.

to provide athletes in underprivileged countries with training and equipment; (3) entered into sham contracts and consulting agreements on behalf of the SLBC; (4) recorded payments and benefits which the SLBC provided to IOC members inaccurately in corporate books and records; (5) placed false, fraudulent, and misleading information in SLBC financial records and statements, and (6) failed to disclose material information in public documents.

Based on the foregoing, Count I of the indictment alleges ninety-eight overt acts by one or both Defendants in furtherance of a conspiracy to defraud in violation of 18 U.S.C. § 371.  The conspiracy count is based upon four substantive offenses– the three substantive offenses alleged in the remaining counts of the indictment, and fraud in procuring an alien registration receipt card by false claims and statements in violation of 18 U.S.C. § 1546.  Counts II through V of the indictment each allege one specific instance of Defendants' use of "a facility in interstate or foreign commerce" with the intent to carry on an "unlawful activity" in violation of 18 U.S.C. § 1952(a)(3).  The unlawful activity or predicate offense on which Counts II through V rely is "bribery of various IOC members" in violation of Utah Code Ann. § 76-6-508(1)(a).[5]  Counts

---

[5]  Count II alleges a $12,000 wire transfer between Salt Lake City and London, England to an IOC member.  Count III alleges a $1,000 wire transfer between the same locations to another IOC member.  Count IV alleges a $15,000 wire transfer between Salt Lake City and Paris, France to an IOC member.  Finally, Count V alleges a faxed letter between Colorado Springs, Colorado and Salt Lake City from Alfredo La Mont to Defendant Welch.

VI through X each allege one instance of Defendants' use of the United States mail to further their unlawful scheme in violation of 18 U.S.C. § 1341.[6] Finally, Counts XI through XV each allege one instance of Defendants' use of "wire communications in interstate and foreign commerce" to further their unlawful scheme in violation of 18 U.S.C. § 1343.[7]

## II.

Defendants filed a motion to dismiss the indictment in its entirety pursuant to Fed. R. Crim. P. 12 for failure to state a criminal offense. The district court referred Defendants' motion to a magistrate judge, who after briefing and oral argument, issued two reports and recommendations. See 28 U.S.C. § 636(b)(1). The first report recommended the district court deny Defendants' motion to dismiss Counts II through V. The second report recommended the court deny Defendants' motion to dismiss

---

[6] Count VI alleges the mailing from Salt Lake City to Bethesda, Maryland of a $1,165 check payable to the Fairmont Plaza for the apartment lease of an IOC member's daughter. Count VII alleges the mailing from Salt Lake City to Colorado Springs, Colorado of a $3,000 check payable to "ARCA, Inc." for the benefit of an IOC member. According to the indictment, ARCA was a United States company controlled by Alfredo La Mont. Count VIII alleges the mailing from Salt Lake City to Washington, D.C. of a $5,998 check payable to Howard University for the tuition of an IOC member's son. Count IX alleges the mailing between the same locations of a $9,122 check payable to American University for the tuition of an IOC member's daughter. Finally, Count X alleges the mailing between the same locations of a $8,557.50 check payable to American University for the tuition of the same IOC member's daughter.

[7] Counts XI, XII, XIII and XV allege the same underlying transactions as Counts IV, II, III, and V, respectively. See supra n.5. Count XIV alleges a wire transfer from Salt Lake City to Springfield, Missouri to an IOC member's son.

7

Counts VI through XV.[8]  Defendants lodged timely objections to both reports.  See id.

Upon de novo review, the district court rejected the magistrate judge's recommendations

and dismissed the indictment in two stages.

A.

Like the magistrate judge's first report, the district court's first order focused

exclusively on Counts II through V of the indictment, or the Travel Act counts.

Commonly referred to as the Travel Act, 18 U.S.C. § 1952 provides in relevant part:

> **(a)**  Whoever . . . uses the mail or any facility in interstate or foreign commerce, with intent to–
>
> . . .
>
> **(3)** . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
> and thereafter performs or attempts to perform–
>
> **(A)** an act described in paragraph . . . (3) shall be fined under this title, imprisoned not more than 5 years, or both[.]

Id. § 1952(a)(3)(A).  Subsection (b) defines "unlawful activity" as, among other

things, "bribery . . . in violation of the laws of the State in which committed[.]"

Id. § 1952(b)(i)(2).  In this case, the "unlawful activity" on which the Travel Act

counts rely is bribery as defined by Utah Code Ann. § 76-6-508(1)(a).  Entitled

"Bribery of or receiving bribe by person in the business of selection, appraisal,

---

[8]  Although the magistrate judge never addressed Count I's conspiracy allegations, the judge apparently believed Count I's sufficiency turned on the sufficiency of the indictment's substantive counts.  Aside from Count I's immigration fraud charge under § 1546, which Defendants have not challenged on appeal, this is true.

or criticism of goods or services," § 76-6-508(1)(a) provides in relevant part:

> (1)  A person is guilty of a class A misdemeanor when, without the consent of the . . . principal, contrary to the interests of the . . . principal:
>         (a) he confers, offers, or agrees to confer upon the . . . agent, or fiduciary of . . . [the] principal any benefit with the purpose of influencing the conduct of the . . . agent, or fiduciary in relating to his . . . principal's affairs[.]

The district court dismissed the Travel Act counts based upon alternative holdings.  The court initially held that § 76-6-508 was an invalid predicate for charging a violation of the Travel Act.  The court offered several reasons for its holding.  First, the court suggested that "[f]ederal prosecution of this case based upon Utah law does not advance the goals of the Travel Act."  According to the court, "Congress enacted [the Travel Act] to assist states in enforcing their laws against participants in organized crime who use state boundaries to avoid prosecution.  A fair reading of the indictment does not reflect that defendants are members of a criminal enterprise, an organized syndicate or a 'crime family.'"  (citation omitted).  Second, the court relied on a lack of reported Utah cases involving § 76-6-508 outside the employment context to suggest Defendants' alleged conduct did not violate the Utah bribery statute and thus did not constitute "unlawful activity" as required by the Travel Act.  Similarly, the court relied on the lack of prior state prosecutions under the statute to suggest "that Utah does not view such conduct as a prosecutorial priority, or even a crime."  Finally, the court suggested the indictment threatened the balance of power between federal and state government.  The court stated "neither the history nor the language of the Travel Act

9

would sanction an expansive interpretation that would jeopardize the balance of powers between the state and federal governments when a continuous course of organized criminal conduct is not present and when there is no state enforcement to reinforce."

In the alternative, the district court held Utah Code Ann. § 76-6-508(1)(a) was unconstitutionally vague as applied to Defendants. According to the court, neither § 76-6-508(1)(a)'s language nor its prior applications gave Defendants reasonable notice their alleged conduct was proscribed. Suggesting the sufficiency of the Travel Act counts turned on whether Defendants' alleged conduct violated § 76-6-508(1)(a), the court phrased the issue as "whether Utah's commercial bribery statute gave [Defendants] fair warning, in reasonably clear language, that it was criminal to offer inducements and gifts to IOC members to persuade them to vote for Salt Lake City as host for the 2002 Olympic Winter Games."

To support its alternative holding, the district court focused on three phrases within §76-6-508(1)(a). First, the court reasoned the phrase "any benefit" was vague because it "leaves defendants to guess" what conduct is proscribed. The court stated "[i]t . . . broaches absurdity to believe that the [Utah] legislature intended to criminalize good will gifts or gestures, especially in the context of promoting Salt Lake City and the State of Utah on the world stage to host the Olympic Winter Games." Second, the court reasoned the phrase "in relating to his . . . principal's affairs" was vague because it did not specify whether the principal must suffer a detriment as a result of the agent's or

10

fiduciary's acts.  Finally, the court explained the phrase "contrary to the interests of the . . . principal" was vague because "[a] subjective evaluation by the defendants, as well as by police and prosecutors, is required to determine what is 'contrary to the interests' of the IOC and its members."

In the end, the district court summarized its view of the indictment's Travel Act counts:  "[U]nder the guise of aiding Utah with its law enforcement, federal prosecutors have co-opted an obscure Utah misdemeanor bribery statute of uncertain and improbable application as the only basis for charging defendants with four federal Travel Act felonies."  Given its view, the court refused to "speculate that the Utah legislature intended Utah's commercial bribery statute to apply to defendants' alleged conduct in seeking to bring the Olympic Winter Games to Salt Lake City and Utah."

## B.

The district court's second order addressed Counts VI through XV of the indictment, or the mail and wire fraud counts.  The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 respectively, proscribe the use of mail and wire to further a "scheme or artifice to defraud."[9]  In its second order, the court

---

[9] Section 1341 provides in relevant part:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be

(continued...)

11

independently sustained the mail and wire fraud counts, and recognized those counts' "alternative property theories," namely that Defendants contrived a scheme with the intent to defraud the SLBC of (1) "actual property," (2) "its right to control how its property was used," and (3) "its right to defendants' honest services."[10]  The court also sustained Count I of the indictment, the conspiracy count, to the extent it relied on the mail and wire fraud charges.

Nevertheless, the district court held its prior dismissal of the Travel Act counts required dismissal of the conspiracy, mail, and wire fraud counts as well.  The court reasoned the grand jury's decision to indict Defendants on the Travel Act counts may have influenced its decision to indict them on the remaining counts.  The court noted each count of the indictment alleged the same bribery scheme:

---

[9](...continued)
sent or delivered by the Postal Service, . . . shall be fined under this title or imprisoned not more than five years, or both.

  Section 1343 provides in relevant part:
  Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

[10]  Section 1346 defines the phrase "scheme or artifice to defraud" as used in §§ 1341 and 1343, as including a "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.

An analysis of the conspiracy, mail and wire fraud charges indicates that the fraud scheme charged by the grand jury relies heavily on allegations that defendants bribed IOC members unlawfully in order to win the Olympic Winter Games. Review of the indictment reflects inflammatory allegations of bribery in violation of Utah law, unlawful bribery, misappropriation of money and like characterizations.

The court concluded these allegations were so prevalent and interrelated that they could not be segregated and stricken without improperly amending the indictment in violation of the Fifth Amendment's grand jury guarantee.

III.

On appeal, the Government challenges all adverse aspects of the district court's two orders dismissing the indictment. Defendants, of course, defend those same aspects of the orders. Recognizing that we may affirm on any ground supported by the record, Defendants offer additional arguments which they presented to the district court. See United States v. Lott, 310 F.3d 1231, 1242 n.7 (10th Cir. 2002). Most notably, Defendants argue they are entitled to dismissal of the Travel Act counts as a matter of law because under Swiss law, an IOC member is not an "agent or fiduciary" of the IOC as required to support a charge under Utah Code Ann. § 76-6-508(1)(a). Defendants further argue the conspiracy, mail, and wire fraud counts, viewed apart from the Travel Act counts, fail to state an offense.

We review the sufficiency of an indictment and issues of statutory interpretation involved therein de novo. See United States v. Giles, 213 F.3d 1247, 1248-49 (10th Cir. 2000). Where a defendant challenges the sufficiency of an indictment for failure to state

13

an offense, a court generally is bound by the factual allegations contained within the four corners of the indictment. See United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994).[11] "An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true. Courts should refrain from considering evidence outside the indictment when testing its sufficiency." Id. (citation omitted). An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense. See United States v. Avery, 295 F.3d 1158, 1174 (10th Cir. 2002). We begin our review of the indictment with an analysis of its Travel Act counts.

A.

Concerned with state and local governments' inability to cope with the interstate nature of complex criminal enterprises, Congress enacted the Travel Act as part of the Attorney General's 1961 legislative program directed against "organized crime." See Perrin v. United States, 444 U.S. 37, 41 (1979). The Travel Act "impose[s] criminal sanctions upon the person whose work takes him across State or National boundaries in aid of certain 'unlawful activities.'" H.R. Rep. No. 966, at 4 (1961), reprinted in 1961 U.S.C.C.A.N. 2664, 2666 (letter from Attorney General Robert F. Kennedy to

---

[11] The only recognized exception to this rule, inapplicable in this case, is where factual issues are undisputed and the Government fails to object to the district court's resort to evidence outside the four corners of the indictment. Hall, 20 F.3d at 1087.

14

the Speaker of the House of Representatives). The Travel Act is, "in short, an effort to deny individuals who act [with the requisite] criminal purpose access to the channels of commerce." Erlenbaugh v. United States, 409 U.S. 239, 246 (1972).

As set forth by the Act's plain language, the elements necessary to sustain a Travel Act conviction are (1) travel in interstate or foreign commerce or use of the mail or any facility in interstate or foreign commerce, (2) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and (3) performance of or an attempt to perform an act of promotion, management, establishment, or carrying on of the enumerated unlawful activity. 18 U.S.C. § 1952(a)(3). The district court never suggested the Travel Act counts fail to allege the foregoing elements, and neither have Defendants. Instead, the concern focuses largely on whether the Utah Commercial Bribery Statute legitimately defines the "unlawful activity" required for this Travel Act prosecution.

1.

In Perrin the Supreme Court upheld the Travel Act conviction of a defendant who, with two other individuals, engaged in a scheme to steal confidential data from a geological exploration company. The three sought to bribe a company employee as proscribed by Louisiana state law. The Court held: "Congress intended 'bribery . . . in violation of the laws of the State in which committed' to encompass conduct in violation of state commercial bribery statutes" Perrin, 444 U.S. at 50. Given both its title and

15

language, we safely may label Utah Code Ann. § 76-6-508 a "state commercial bribery statute." After Perrin, the proposition that § 76-6-508, if constitutionally drawn, may serve as a predicate for a Travel Act violation appears unremarkable. Yet the district court offered multiple reasons why, apart from § 76-6-508(1)(a)'s actual language, that proposition did not apply in this case.

a.

First, the district court concluded the Travel Act counts are insufficient because they fail to allege Defendants are members of a criminal enterprise or organized crime. Neither § 1952's language nor, since Perrin, the case law construing it support the district court's conclusion. See United States v. Dailey, 24 F.3d 1323, 1329 (11th Cir. 1994) (noting the "widespread use of the Travel Act in federal prosecutions and judicial approval of its applications to offenses not associated with organized crime"). Indeed, the prosecution in Perrin of an apparently isolated bribery scheme is more analogous to Defendant's prosecution in this case than to an "organized crime" prosecution. By its plain language, "§ 1952 imposes penalties upon any individual crossing state lines or using interstate facilities for any of the statutorily enumerated offenses." United States v. Nardello, 393 U.S. 286, 293 (1969). As we stated nearly two decades ago in United States v. Davis, 780 F.2d 838, 843 (10th Cir. 1985): "While we recognize that the legislative history of the Travel Act indicates it was aimed at combating organized crime, it has been clearly established that its reach is not limited to that end." (citing

16

Erlenbaugh, 409 U.S. at 247 n.21); compare H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 243-49 (1989) (declining to limit RICO's reach despite its purpose to fight organized crime).

Similarly, where bribery is the predicate offense in a § 1952 prosecution, neither the Act's language nor the case law construing it support the district court's conclusion that such bribery must be part of a criminal or business enterprise. The Travel Act's definition of "unlawful activity" set out in subsection (b) includes two relevant subparts. Subpart (i)(1) defines "unlawful activity" as "any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances . . . , or prostitution offenses in violation of the laws of the State in which they are committed or of the United States[.]" 18 U.S.C. § 1952(b)(i)(1). Subpart (i)(2) defines "unlawful activity" as "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States[.]" Id. § 1952(b)(i)(2). Unlike subpart (i)(1), conspicuously absent from subpart (i)(2)'s definition is any requirement that bribery be part of a business enterprise. Clearly, "the language of the Act reflects an intent to treat extortion, bribery, and arson differently from gambling, liquor, narcotics, and prostitution offenses." United States v. Wander, 601 F.2d 1251, 1258 (3d Cir. 1979) (noting the uniformity among the courts of appeals in holding the business enterprise limitation does not apply to subpart (i)(2)). Provided a sufficient interstate nexus, the Government may rely on a single act of bribery to establish a

17

Travel Act violation.  See United States v. Gooding, 473 F.2d 425, 427 (5th Cir. 1973).[12]

b.

Second, the district court's reliance on the lack of reported cases involving

Utah Code Ann. § 76-6-508 outside the employment context, and more specifically,

the lack of Utah state prosecutions under the present allegations is misplaced.  These

observations have no bearing on the question of whether § 76-6-508(1)(a) properly

characterizes Defendants' alleged activity as bribery.  The predicate offense, i.e., the

"unlawful activity," in a Travel Act prosecution serves only to define the accused's

conduct.  See United States v. Davis, 965 F.2d 804, 809-10 (10th Cir. 1992).  The

_____

[12]  Although the legislative history of the Travel Act is sparse, see Rewis
v. United States, 401 U.S. 808, 811 (1971), it supports our reading of § 1952(b):
>        The House version of the Travel Act contained an amendment
> unacceptable to the Justice Department.  The Senate bill defined
> "unlawful activity" as "any business enterprise involving gambling,
> liquor . . . narcotics, or prostitution offenses in violation of the laws
> of the State . . . or . . . extortion or bribery in violation of the laws of
> the States."  S. Rep. No. 644, 87th Cong., 1st Sess., 2 (1961).  However,
> the House amendment, by defining "unlawful activity" as "any business
> enterprise involving gambling, liquor, narcotics, or prostitution offenses
> or extortion or bribery in connection with such offenses in violation of
> the laws of the State," required that extortion [and bribery] be connected
> with a business enterprise involving the other enumerated offenses.  H. R.
> Rep. No. 966, 87th Cong., 1st Sess., 1 (1961). [. . .]  The House Senate
> Conference Committee accepted the Senate version.  See H. R. Conf.
> Rep. No. 1161, 87th Cong., 1st Sess. (1961).

Nardello, 393 U.S. at 291-92 (unbracketed ellipses in original).  Thus, Congress
rejected an amendment by the House Committee that would have limited the Travel
Act's proscription of bribery to bribery in connection with business enterprises
involving gambling, liquor, narcotics, or prostitution.  See Dailey, 24 F.3d at 1328.

18

Travel Act proscribes not the unlawful activity per se, but the use of interstate facilities with the requisite intent to promote such unlawful activity. See United States v. Millet, 123 F.3d 268, 277-78 (5th Cir. 1997).

An actual violation of § 76-6-508(1)(a) is not an element of the alleged Travel Act violations in this case and need not have occurred to support the Government's § 1952 prosecution. See Davis, 965 F.2d at 809-10; see also United States v. Loucas, 629 F.2d 989, 991-92 (4th Cir. 1980) ("'[A]ccomplishment of the State substantive offense is not a prerequisite to a § 1952 conviction.'") (quoting McIntosh v. United States, 385 F.2d 274, 277 (8th Cir. 1967)); compare 18 U.S.C. § 1961(1)(A) ("'racketeering activity' means . . . any act or threat involving bribery . . . chargeable under State law"). Consistent with this view, no court to our knowledge has ever held the underlying elements of the predicate offense need be alleged as part of a Travel Act charge. The Act requires only that Defendants intended "to promote . . ." or "facilitate the promotion . . ." of the predicate state offense. For instance, an individual may violate the Travel Act simply by attempting to perform a specified "unlawful act" so long as that individual has the requisite intent required by the "unlawful act." See United States v. Jones, 909 F.2d 533, 539 (D.C. Cir. 1990).

Moreover, viewing a prosecutor's failure to utilize a penal statute in a particular instance as a guide to statutory construction finds no support in law. "[E]xecutive branch policy judgments about the desirability of certain types of prosecutions . . . are not guided

solely by the language of the statute." United States v. Piervinanzi, 23 F.3d 670, 683 (2d Cir. 1994). Such judgments rest within a prosecutor's sound discretion. That discretion may not be guided by the language of the statute at all, but by other considerations. Even if a prosecutor's silence said anything about the meaning of a penal statute, which it does not, we "have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." Crandon v. United States, 494 U.S. 152, 177 (1990) (Scalia, J. concurring); accord Dolfi v. Pontesso, 156 F.3d 696, 700 (6th Cir. 1998). Separation of power concerns and the recognized role of courts as final arbiters of what the law is clearly dictate this conclusion. See Norman J. Singer, Sutherland Statutory Construction § 5A:11 at 498-99 (6th ed. 2002) (noting that "courts have quite uniformly held that the judiciary is not bound by an attorney general's opinion").

c.

Finally, due to misplaced federalism concerns over the Government's prosecution, the district court refused to give the Travel Act what it labeled an "expansive interpretation." In discounting those same concerns over twenty years ago, the Supreme Court explained that Congress in enacting the Travel Act–

> employed its now familiar power under the Commerce Clause of the Federal Constitution to prohibit activities of traditional state and local concern that also have an interstate nexus. . . . Because the offenses are defined by reference to existing state as well as federal law, it is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be

20

inadequate state authority and state enforcement.

Perrin, 444 U.S. at 42. The Court recognized that "so long as the requisite interstate nexus is present, [§ 1952] reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance[.]" Id. at 50. Because the Travel Act was within Congress' constitutional prerogative to enact, commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern. See United States v. LeFaivre, 507 F.2d 1288, 1294 (4th Cir. 1974). Accepting the indictment's factual allegations as true, the interstate nexus in this case is not only adequate, but substantial. Thus, the district court's federalism concerns are unwarranted.

In its order dismissing the indictment's Travel Act counts, the district court narrowly perceived the indictment as the Government's attempt to assert jurisdiction over a matter of purely state and local concern. Cf. United States v. Ferber, 966 F. Supp. 90, 105-07 (D. Mass. 1997) (making similar policy argument). Yet even apart from the Travel Act's mandate to deny criminals access to the channels of interstate commerce, this prosecution is very much a matter of federal concern. The Olympic Games are hardly an insular event. The 2002 Winter Olympic Games were an international event hosted by Salt Lake City, Utah and the United States. As the representative of the United States before the international Olympic community and the entity responsible for selecting Salt Lake City to bid on the Winter Games, the USOC, on behalf of the United States and through the Justice Department, has an undeniable interest in

21

denouncing corruption in the selection process for the host city of the Olympic Games.

2.

Broader concerns resolved, we turn next to the language of Utah Code Ann. § 76-6-508, and in particular, subsection (1)(a), to determine whether the Utah commercial bribery statute's "definition" of bribery is unconstitutionally vague. Bribery occurs under § 76-6-508(1)(a) when an individual "without the consent of the . . . principal, contrary to the interests of the . . . principal . . . confers, offers, or agrees to confer upon the . . . agent or fiduciary of a[] . . . principal any benefit with the purpose of influencing the conduct of the . . . agent, or fiduciary in relating to his . . . principal's affairs[.]" Id. § 76-6-508(a)(1).

Focusing primarily on the phrases "any benefit," "in relating to," and "contrary to the interests of," the district court concluded the Utah statute's language failed to provide Defendants with fair notice that their "bid-seeking efforts" constituted "unlawful activity" within the meaning of the Travel Act. Consequently, the court held § 76-6-508(1)(a) unconstitutionally vague, proffering an additional basis why the statute could not serve as the predicate offense for the indictment's Travel Act counts. Our analysis of the Utah statute as applied to the indictment in this case persuades us the district court failed to narrow its inquiry consistent with the proper constitutional standard, and thus erred in its holding.

22

When considering a vagueness challenge to a penal statute, courts begin with the presumption that the statute comports with the requirements of federal due process and "must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." United States v. LaHue, 261 F.3d 993, 1004 (10th Cir. 2001) (internal quotations omitted). The Constitution does not impose "[i]mpossible standards of specificity" upon legislatures. Jordan v. De George, 341 U.S. 223, 231 (1951). Courts should remain ever mindful that "general statements of the law are not inherently incapable of giving fair and clear warning." United States v. Lanier, 520 U.S. 259, 271 (1997). "Due process requirements are not 'designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" Id. at 271 (quoting Colten v. Kentucky, 407 U.S. 104, 110 (1972)).

Realistically, "'most statutes . . . deal with the untold and unforeseen variations on factual situations and the practical necessities of discharging the business of government inevitably limit the specificity with which legislatures can spell out prohibition.'" United States v. Agnew, 931 F.2d 1397, 1404 (10th Cir. 1991) (quoting Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952)). Consistent with this view, judicial review of a penal statute generally is restricted to consideration of the statute as applied in a particular case, provided the statute

23

does not threaten to chill the exercise of constitutional rights. See United States v. Saffo, 227 F.3d 1260, 1270 (10th Cir. 2000). Because the Utah commercial bribery statute does not implicate constitutional rights, we will not generalize beyond the conduct alleged in the indictment.

Utah Code Ann. § 76-6-508(1)(a) is unconstitutionally vague as applied to Defendants only if its language "fails to provide people of ordinary intelligence a reasonable opportunity to understand" that Defendants' conduct, as alleged in the indictment, was proscribed. Hill v. Colorado, 530 U.S. 703, 732 (2000). In making that determination, we interpret the statute consistent with Utah state law. See United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988). Unfortunately, the Utah Supreme Court has not addressed the constitutionality of § 76-6-508. The court has, however, provided useful principles to assist us in addressing that question:

> When interpreting statutes our primary goal is to evince the true intent and purpose of the legislature. We discern legislative intent and purpose by first looking to the "best evidence" of its meaning, which is the plain language of the statute itself. When examining the statutory language, we assume the legislature used each term advisedly and in accordance with its ordinary meaning.

State v. Martinez, 52 P.3d 1276, 1278 (Utah 2002) (internal quotations and citations omitted). Where the words of a statute are unambiguous, the Utah Supreme Court "has a long history of relying on dictionary definitions to determine plain meaning." State v. Redd, 992 P.2d 986, 990 (Utah 1999) (relying on dictionary definition of "remove" as used in a penal statute).

24

The district court concluded the words "any benefit" were "inherently ambiguous because the breadth of the language encompasses all gifts including expressions of courtesy such as good will gifts." We agree with the district court that "it . . . broaches absurdity to believe the [Utah] legislature intended to criminalize good will gifts and gestures, especially in the context of promoting Salt Lake City and the State of Utah on the world stage to host the Olympic Winter Games." Neither § 76-6-508(1)(a), nor the indictment, however, in any way seek to criminalize "good will gifts and gestures." Webster's Third New Int'l Dictionary 979 (1981) (hereinafter "Webster's") defines "good will" as "a will acting freely from pure disinterested motives." Utah Code Ann. § 76-6-508(1)(a), in clear contrast, requires a defendant confer or agree to confer a "benefit" upon the agent or fiduciary of a principal "with the purpose of influencing the conduct of the . . . agent, or fiduciary in relating to his . . . principal's affairs[.]" (emphasis added). The district court failed to appreciate the limiting effect of § 76-6-508(1)(a)'s mens rea requirement on the phrase "any benefit" and on the statute as a whole.

To establish Defendants' violation of the Travel Act, the Government must prove, among other things, that Defendants acted with a culpable state of mind. The Travel Act requires an act "with intent to . . . promote . . . or facilitate the promotion . . . of any unlawful activity[.]" The "unlawful activity" in this case,

25

bribery under § 76-6-508(1)(a), requires an act "with the purpose of influencing . . . conduct[.]" Both statutes require the Government prove Defendants acted with a higher level of culpability than mere knowledge.[13] The Travel Act requires a specific "intent to . . . promote[.]" See United States v. James, 210 F.3d 1342, 1345 (11th Cir. 2000) (Travel Act violation is a specific intent crime); see also United States v. Hall, 536 F.2d 313, 329-30 (10th Cir. 1976) (approving a specific intent instruction on a Travel Act charge). In other words, the Travel Act requires a defendant act not only with knowledge of what he is doing, but also with the objective of promoting some unlawful activity. See United States v. Blair, 54 F.3d 639, 642 (10th Cir. 1995) ("A specific intent crime is one in which an act was committed voluntarily and purposely with the specific intent to do something the law forbids.") (internal quotations omitted). Meanwhile, § 76-6-508(1)(a) requires a purposeful act. A person acts purposely if he consciously desires his conduct bring about a particular result, whatever the actual likelihood of that result. See United States v. Bailey, 444 U.S. 394, 404 (1980). As the Court explained in Bailey, acting with a purpose and with a specific intent are much the same. Id. at 403-407.[14]

_____

[13] A person acts knowingly or with a "general intent" if he is aware that the result is practically certain to follow from his conduct, whatever his desire may be as to that result. United States v. Bailey, 444 U.S. 394, 404 (1980).

[14] In Bailey, the Court explained that "[i]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." 444 U.S. at 405. Today, common law

(continued...)

26

A vagueness challenge to a penal statute based on insufficient notice rarely succeeds where the requisite mental state is one of purpose or specific intent. The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." Colautti v. Franklin, 439 U.S. 379, 395 (1979), limited on other grounds by Webster v. Reproductive Health Servs., 492 U.S. 490 (1989). The Court explained nearly sixty years ago that "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." Screws v. United States, 325 U.S. 91, 102 (1945) (plurality); accord United States v. Stewart, 872 F.2d 957, 959 (10th Cir. 1989). This is so because to meet the statute's mens rea requirement, a defendant must consciously behave in a way the law prohibits, "and such conduct is a fitting object of criminal punishment." United States v. United States Gypsum Co., 438 U.S. 422, 445 (1978).[15]

_____

[14](...continued)
principles of intent "bow to legislative mandates." Id. at 406. "[W]hat intent, if any, is necessary for the violation of a statute is a legislative matter to be determined by the language of the statute and the purpose it was meant to serve." Agnew, 931 F.2d at 1408.

[15] Despite Defendants' contrary assertion, the Government is not required to prove Defendants specifically intended to violate Utah Code Ann. § 76-6-508(1)(a) to establish the requisite "unlawful activity" under the Travel Act. Cf. United States v. Hawthorne, 356 F.2d 740, 742 (4th Cir. 1966) (holding the Travel Act did not require proof defendant actually knew he was violating Indiana state law); see also Blair, 54 F.3d at 643 ("[A] specific intent crime normally does not necessitate proof that the

(continued...)

27

Contrary to the district court's conclusion, no construction of § 76-6-508(1)(a) as applied to the allegations of the Travel Act counts could encompass those who confer or attempt to confer "benefits" upon an agent or fiduciary without unlawful purpose. The district court expressed concern that the words "any benefit" "leaves defendants to guess whether such gestures as transporting IOC members to and from the airport is sanctioned by § 76-6-508, but providing dinner for them is not; whether providing dinner is legal under the statute, but providing lodging is not; and so on and so forth." In doing so, the court went well beyond the four corners of the indictment to hypothetical "benefits" which § 76-6-508(1)(a) may or may not proscribe. See Hill, 530 U.S. at 733 (rejecting "hypertechnical theories" as to what a penal statute covered).

Counts II, III, and IV of the indictment allege Defendants made or caused to be made international wire transfers in the amounts of $12,000, $1,000, and $15,000 respectively. Those counts further allege Defendants made those transfers to three IOC members with the "intent to . . . promote . . . or facilitate the promotion" of the crime of bribery as defined by § 76-6-508(a)(1). Count V alleges Defendants received

---

[15](...continued)
defendant was specifically aware of the law penalizing his conduct.") (internal quotations omitted). The intent which § 76-6-508(1)(a) requires is the intent to influence conduct, not the intent to violate the statute. See United States v. Paradies, 98 F.3d 1266, 1285 (11th Cir. 1996). "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." Cheek v. United States, 498 U.S. 192, 199 (1991). Unless the legislature decrees otherwise, we are bound to abide by that rule in construing a penal statute. See Blair, 54 F.3d at 643 (citing Ratzlaf v. United States, 510 U.S. 135, 149 (1994)).

an interstate fax from Alfredo La Mont, the USOC representative Defendants allegedly retained to assist them in their bribery scheme. That count further alleges Defendants received the fax with the "intent to . . . promote . . . or facilitate the promotion" of the crime of bribery as defined by § 76-6-508(1)(a).

At trial, Defendants will be free to argue before the jury that they facilitated these transfers and correspondence, if proven, absent the requisite intent to promote bribery. Absent proof of an intent to influence conduct, Defendants' use of interstate and international channels of commerce would not promote the designated "unlawful activity" as required by 18 U.S.C. § 1952(a). See Jones, 909 F.2d at 538-39 (proper Travel Act instruction "fully incorporates the elements of the relevant state law offense into the definition of the Travel Act violation"). That argument, however, is premature because at this stage we accept the indictment's allegations as true.

Employing much the same rationale as the district court, Defendants suggest "most gifts given to persons in a position to make decisions have, at some level, an intent to influence those persons, but not all of those gifts are unlawful." (emphasis added). Defendants add the Government does not "suggest that all benefits given with the intent to influence IOC members were bribes." (emphasis added). Neither § 76-6-508(1)(a) nor the indictment, however, concerns itself with "most gifts" and "all benefits." The indictment plainly states that certain expenditures, gifts, and other benefits tendered to IOC members were within IOC guidelines and permissible.

29

The indictment does not oppose Defendants' undertaking on behalf of the SLBC to persuade IOC members, within the bounds of the law, as to the merits of their cause.

Instead, the indictment alleges Defendants clandestinely employed interstate and international channels of commerce to assist them in conferring direct and indirect cash payments and other benefits on IOC members "with the purpose of influencing" those members to cast their votes for Salt Lake City–not on the basis of the city's merits as mandated by the IOC, but on the basis of the members' personal gain. In other words, the indictment alleges Defendants used the channels of commerce to promote bribery, "a concept well-understood by the ordinary person." Gaudreau, 860 F.2d at 363 (rejecting a constitutional challenge to Colorado's commercial bribery statute when used as a predicate for a RICO prosecution). Defendants, like the district court, improperly wander beyond the four corners of the indictment to argue their case. Speculation about the vagueness of § 76-6-508(1)(a) in hypothetical situations is inadequate to sustain an attack on a Utah statute which surely applies to the conduct alleged in the indictment. See Saffo, 227 F.3d at 1270 ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

The district court's oft-repeated view that the Utah legislature could not have intended § 76-6-508(1)(a) to encompass Defendants' alleged conduct finds no support in law. While we seriously doubt the Utah legislature would endorse a "win at all costs" approach in regard to the Olympic Winter Games, whether it might is irrelevant.

30

Nothing in the applicable law, i.e., the language of the Utah statute, its sparse legislative history, or the few cases construing it, binds us to such a proposition. As we earlier explained, "most statutes . . . deal with the untold and unforeseen variations on factual situations[.]" Agnew, 931 F.2d at 1404 (internal quotations omitted). Section 76-6-508(1)(a) is no exception. Due process does not limit application of penal statutes to factual situations similar to prior precedents. Lanier, 520 U.S. at 269. The "touchstone" for due process is whether § 76-6-508(1)(a), "either standing alone or as construed, made it reasonably clear at the relevant time that [Defendants'] conduct was criminal." Id. at 267. We conclude § 76-6-508(1)(a), and more specifically its subject–"any benefit"– is not unconstitutionally vague as applied to Defendants.

b.

The district court next reasoned the phrase "in relating to his . . . principal's affairs" was unduly vague because it left one to guess whether the principal need suffer some detriment and was thus "susceptible to two distinct interpretations."[16] The requirement that one must intend to influence an agent's or fiduciary's conduct

---

[16]  On appeal, Defendants throw into the mix of purportedly vague terms the phrase "without the consent of . . . the principal[.]" They complain that § 76-6-508(1)(a) "does not explain whether 'consent' means affirmative consent by the principal or whether 'consent' could be inferred from the principal's acquiescence in prior, similar gifts." Defendant's argument is unfounded. Webster's includes "acquiescence" in its definition of "consent." Webster's, supra at 482. The law has long recognized that consent generally may be "express" or "implied," and we will not depart from that common understanding in interpreting § 76-6-508(1)(a).

31

"in relation to" his principal's affairs consistently appears in state commercial bribery statutes. See United States v. Parise, 159 F.3d 790, 804 n.1 (3d Cir. 1998) (Garth, J., dissenting) (citing twenty-one state codes). Section § 76-6-508(1)(a) is unique in that it uses the phrase "in relating to" instead of "in relation to." But we discern no meaningful difference between the two phrases and none is suggested. See id. (including § 76-6-508(1)(a) in state code citations). The Supreme Court has described the phrase "in relation to" as "expansive . . . . According to Webster's, 'in relation to' means 'with reference to' or 'as regards.'" Smith v. United States, 508 U.S. 223, 237 (1993) (quoting "Webster's New International Dictionary, at 2102"). No court to our knowledge has ever held such words incapable of conveying sufficient understanding in the bribery context.

Despite the district court's concern, § 76-6-508(1)(a)'s language does not require the principal actually "suffer some detriment." Cf. Parise, 159 F.3d at 798-801 (refusing to read into Pennsylvania's commercial bribery statute a requirement that the agent acted against the principal's interest). Such a reading of the statute might attribute to the Utah legislature the unexpressed intent to limit § 76-6-508(1)(a)'s reach to instances where the ultimate outcome harmed the principal. See Bailey, 444 U.S. at 406-07 (recognizing the criminal justice system "could easily fall of its own weight if courts . . . become obsessed with hair-splitting distinctions that [the legislature] neither stated nor implied when it made the conduct criminal").

32

Certainly the selection of Salt Lake City to host the 2002 Olympic Winter Games, in itself, was not detrimental to the IOC. The Games, by all accounts, were a success. Section 76-6-508(1)(a), however, proscribes conduct spawned by a corrupt intent to compromise an agent's duty of loyalty to the principal. Purposeful conduct designed to compromise this duty of loyalty is the harm at which the statute is aimed. We conclude that whatever the exact contours of § 76-6-508(1)(a)'s "in relating to" language, the conduct which Defendants allegedly sought to influence in this case, i.e., IOC members' votes, undoubtedly "relates to" the IOC's "affairs."

c.

The court further reasoned the phrase "contrary to the interests of the . . . principal" was unduly vague because "[a] subjective evaluation by the defendants . . . is required to determine what is 'contrary to the interests' of the IOC and its members." Consistent with the statute's aim to protect the duty of loyalty, § 76-6-508(1)(a) does not require that the principal suffer some detriment. Rather, the statute requires only that the proscribed conduct be "contrary to the interests of" the principal, or in other words, opposed to the principal's concerns.[17] See Webster's, supra at 495, 1178

---

[17] At least one other state includes a similar phrase in its commercial bribery statute. See N.H. Rev. Stat. Ann. § 638:7 ("contrary to the best interests of the . . . principal"). In addition to New Hampshire, at least eight states' commercial bribery statutes, like § 76-6-508(1)(a), use the phrases "any benefit," "without the consent of," and "in relation to." Ala. Code § 13A-11-120; Ariz. Rev. Stat. § 13-2605; Conn. Gen. Stat. § 53a-60; 720 Ill. Comp. Stat. 5/29A-1; Nev. Rev. Stat. 207.295;

(continued...)

(defining the terms "contrary" and "interest" respectively).

The IOC's interest is not limited to the desirability of the chosen site as the district court suggested. The IOC clearly has an interest in the fairness of the bidding process as evidenced by, among other things, the Olympic Charter. As stated in the indictment: "The Olympic Charter prohibited IOC members from accepting from governments, organizations, or other legal entities or natural persons, any mandate liable to bind them or interfere with their freedom of action and vote." Fairness in the site selection process depends on the undivided loyalty of IOC members to the IOC– a loyalty critical to the IOC's mission. See Report of the IOC ad hoc Commission to Investigate the Conduct of Certain IOC Members and to Consider Possible Changes in the Procedures for the Allocation of the Games of the Olympiad and Olympic Winter Games (1999). We believe a person of ordinary intelligence would understand that Defendants' alleged conduct was "contrary to the interest of" the IOC.

To the extent, if any, the phrase "contrary to the interest of" requires "subjective evaluation by the defendants," it is like the myriad of other phrases appearing in § 76-6-508(1)(a) with which the district court found fault. "'[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently

_____

[17](...continued)
N.Y. Penal Law § 180.00 (McKinney); N.D. Cent. Code § 12.1-12-08; S.D. Codified Laws § 22-43-1. Reportedly, thirty-seven states prohibit commercial bribery in some form. See Don Zarin, Doing Business Under the Foreign Corrupt Practices Act, § 11.5 at 11-8 n.34.1 (Practicing Law Institute 2001).

estimates it, some matter of degree.'" United States v. Villano, 529 F.2d 1046, 1055 (10th Cir. 1976) (quoting Nash v. United States, 229 U.S. 373, 377 (1913)). What the district court failed to recognize in analyzing the phrase "contrary to the interest of," as well as § 76-6-508(1)(a)'s other phrases, is that–

> [l]aws cannot define the boundaries of impermissible conduct with mathematical certainty. . . . "The precise course of the [boundary] may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk."

Gaudreau, 860 F.2d at 363 n.17 (quoting United States v. Wurzbach, 280 U.S. 396, 399 (1930)). "Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines, 342 U.S. at 340.

We do not suggest Defendants have violated the Travel Act or even come "perilously close" to violating it, although the indictment plainly supports the former view. That ultimately is for a jury to decide. What we decide is that the statutory definition of "unlawful activity," i.e., Utah Code Ann. § 76-6-508(1)(a), on which the indictment's Travel Act counts rely, conveyed sufficiently clear warning to Defendants as to the criminal nature of their alleged conduct when measured by common understanding and practices. See Villano, 529 F.2d at 1055; see also Gaudreau, 860 F.2d at 359 n.2 (noting that state "commercial bribery statutes have been uniformly upheld in the face of vagueness challenges"). The possibility

35

Defendants, sophisticated businessmen, would misunderstand the unremarkable proposition that their use of the channels of commerce in the manner alleged might promote, in violation of the Travel Act, the "unlawful activity" of bribery as defined by § 76-6-508(1)(a) seems remote. See Hill, 530 U.S. at 732-33. That possibility becomes still more remote when considering the indictment's allegations as to Defendants' concerted efforts to conceal their conduct. See supra at 5-6; see also United States v. Rybicki, 287 F.3d 257, 264 (2d Cir. 2002) (noting that a mail fraud defendant's efforts to avoid detection by omitting information from financial records was "indicative of consciousness of guilt").[18]

3.

Although Defendants raised the issue, one aspect of § 76-6-508(1)(a) upon which the district court declined comment involves the requisite relationship of principal and agent. Defendants argue that because the requisite relationship did not

---

[18] To comport with due process, a penal statute must not only provide people of ordinary intelligence a reasonable opportunity to understand what conduct it proscribes, but also must give adequate guidance to law enforcement officials, courts, and juries in order to prohibit arbitrary and discriminatory application. See Hill, 530 U.S. at 732-33. Although courts generally should analyze these two factors separately, see LaHue, 261 F.3d at 1005, the district court in this case focused upon the former rather than the latter requirement. Nevertheless, because the same facets of a statute usually raise concerns of both fair notice and adequate enforcement standards, the analysis of the two factors tends to overlap. See id. For the same reasons we hold § 76-6-508(1)(a) provided adequate notice to Defendants of their alleged wrongdoing, we also hold it gave adequate guidance to law enforcement authorities involved in this case. Thus, application of § 76-6-508(1)(a) to Defendants is neither arbitrary nor discriminatory.

exist between the IOC and its members, or, in the alternative, because Defendants could not reasonably have understood such a relationship existed, we should uphold the district court's dismissal of the Travel Act counts.  See Fed. R. Crim. P. 12(b).  According to Defendants, "[t]here is no application of law to facts which transforms this membership organization [the IOC] into a 'principal' and its members into 'agents' or 'fiduciaries.'" Assuming the Government meets its evidentiary burden at trial, we conclude resolution of this argument, like other arguments aimed at § 76-6-508(1)(a)'s language, is properly left to a jury applying the applicable law to the facts of this case.

a.

Defendants argue the question of whether an IOC member is an agent or fiduciary of the IOC "is answered by looking first to the law of the country in which the IOC is organized to determine what rights and obligations Swiss law imposes on this Swiss organization and its members."  Defendants present the affidavit of Dr. Wolfgang Wiegand, an "expert in Swiss law."[19]  Based upon certain presumptions, Dr. Wiegand opines that Swiss law would not recognize IOC members as agents or fiduciaries of the IOC "as defined by the Utah Commercial Bribery Statute."

---

[19] Defendants gave notice in the district court of their proposed application of Swiss law as required by Fed. R. Crim. P. 26.1.  Rule 26.1 requires a party intending "to raise an issue concerning the law of a foreign country" to provide reasonable written notice to opposing parties and the court.

We reemphasize that Federal law, not Swiss law, governs whether Defendants' alleged conduct violated the Travel Act. Thus, federal law, albeit reliant upon definitions derived from state law, governs whether an IOC member is an agent or fiduciary of the IOC.

> It must be made clear that 18 U.S.C. § 1952 charges a Federal crime, and Federal courts are required to consider every element of the crime and every issue raised under each element. The law involved is Federal law, and all issues raised thereunder become Federal law issues. If necessary to the resolution of a § 1952 case, a Federal court may interpret state law, but it does so as one step in the process of properly interpreting a Federal criminal statute.

United States v. D'Amato, 436 F.2d 52, 54 (3d Cir. 1970).

Testimony on the rights and obligations Swiss law imposes on the IOC and its members may be relevant in determining whether such rights and obligations create an agency or fiduciary relationship between the IOC and its members under Utah Code. Ann. § 76-6-508(1)(a). Evidence that addresses the facts and circumstances of the IOC relationship to its members under Swiss law would potentially be relevant, as would evidence of the IOC's and its members' understanding of that relationship. This is so because to prove IOC members acted as agents of the IOC as required by Utah Code Ann. § 76-6-508(1)(a), the Government must establish the IOC manifested that its members could act for it, the members accepted this, and both parties understood this arrangement. See Wardley Corp. v. Welsh, 962 P.2d 86, 89 (Utah App. 1998). Similarly, to prove IOC members acted as fiduciaries of the IOC, the Government must establish that IOC

38

members were in a position superior to the IOC, had a duty to act on its behalf, and had authority to alter the legal relations between the IOC and third parties, or to control the property, interests, or authority of the IOC. See First Sec. Bank v. Banberry Dev. Corp., 786 P.2d 1326, 1333 (Utah 1990).

Although Dr. Wiegand's opinion as to whether, for example, IOC members under Swiss law had authority to alter legal relationships between the IOC and third parties, could indeed be relevant, his conclusory opinion that Swiss law would not recognize IOC members as agents or fiduciaries (i.e., applying the Swiss law standard of "agent" or "fiduciary") is not relevant in determining whether federal law via the Utah Commercial Bribery Statute would do so. To conclude otherwise might very well result in largely disinterested foreign law sheltering from Travel Act prosecution international criminal elements doing business within and without the United States. Sanctioning such shelter would frustrate the significant federal interest in protecting interstate channels of commerce from persons whose criminal activities take them "across State or National boundaries[.]'"[20] H.R. Rep. No. 966 at 4 (emphasis added).

---

[20] Unlike its predecessor, the Restatement (Second) of Conflict of Laws made "[n]o attempt . . . to deal . . . with the special Conflict of Laws problems presented by criminal law." Id. § 2 cmt. c. The commentary notes, however, that "[m]any of the principles stated in this Restatement . . . are applicable to criminal law." Id.; see also Leflar, supra at 45-46. An analysis under the "most significant relationship" approach as described in the Restatement (Second) undoubtedly calls for the application of federal rather than Swiss law in this instance. See id. § 6 (2) (setting forth factors relevant to choice of law including "the relative interests of . . . states in the determination of the

(continued...)

39

b.

Consistent with the Travel Act's mandate, we look to Utah law to provide us with the federal definition of "bribery" applicable in this case. Utah Code Ann. § 76-6-508(1)(a) requires that the recipient of the "benefit" be an "agent" or "fiduciary" of a "principal." The Utah Supreme Court, in a civil law context, defines "agent" as a person authorized by another to "'act on his behalf and subject to his control.'"[21] Gildea v. Guardian Title Co., 970 P.2d 1265, 1269 (Utah 1998) (quoting Restatement (Second) of Agency § 1 (1958)).[22] "Whether an agency relationship exists depends upon all the facts and circumstances of the case." Id. Where evidence as to the alleged agent's authority and/or principal's control is disputed or reasonable inferences drawn from the

---

[20](...continued)
particular issue"). The Utah Supreme Court has endorsed the Restatement's approach in the civil context. Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002). In the criminal context, rarely will another jurisdiction have a more significant relationship to the matter than the prosecuting jurisdiction.

[21] Because the Utah Supreme Court has not specifically addressed the meaning of agent or fiduciary as used in § 76-6-508(1)(a) or any other penal statute, we again rely on general principals of Utah state law. See Meredith v. Winter Haven, 320 U.S. 228, 237-38 (1943). In Meredith, the Supreme Court explained that a federal court must "decide questions of state law when necessary for the disposition of a case brought to it for decision, although the highest court of the state had not answered them, the answers were difficult, and the character of the answers which the highest state court might ultimately give remained uncertain." Id. at 237.

[22] Section 1 of the Restatement (Second) of Agency defines "agency" as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

evidence may differ, the question of whether an agency relationship exists is one of fact for the jury.  See Mecham v. Consolidated Oil & Transp., Inc., 53 P.3d 479, 482 (Utah App. 2002); see also William A. Gregory, The Law of Agency and Partnership § 2 at 4 (3d ed. 2001).

Similarly, the existence of a fiduciary relationship in Utah is a question of fact where the evidence or inferences to be drawn therefrom conflict.  See Rio Algom Corp. v. Jimco Ltd., 618 P.2d 497, 506 (Utah 1980)  "Whether or not a . . . fiduciary relationship exists depends on the facts and circumstances of each individual case. Courts have generally refrained from definitively listing the instances of fiduciary relationships in such a way as to risk excluding the penumbra of unknown or unraised relevant cases."  First Sec. Bank, 786 P.2d at 1332 (internal quotations and footnotes omitted).

Established principles, however, guide the inquiry.  A fiduciary is a person in whom another places particular confidence.  A fiduciary has a duty to act primarily for the benefit of the other and thus also may be an agent.  See Restatement (Second) of Agency § 13 ("An agent is a fiduciary with respect to matters within the scope of his agency.").  "Generally, in a fiduciary relationship, the property, interest, or authority of the other is placed in the charge of the fiduciary."  First Sec. Bank, 786 P.2d at 1333 (internal quotations and footnote omitted).

> There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not

41

only confidence of the one in the other, but there must exist a certain inequality, . . . business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other.

Id. (internal quotations and footnote omitted). The parties may expressly create a fiduciary relationship through contract, or Utah law may imply such a relationship "due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." Id. at 1332 (internal quotations and footnote omitted).[23]

Defendants argue "[n]o reasonable person would expect that IOC members would be considered agents or fiduciaries of the IOC in a criminal prosecution under the commercial bribery statute." Applying the preceding definitions of "agent" and "fiduciary" to the indictment's factual allegations, we disagree. The IOC entrusts its members with the power and responsibility to select on behalf of the IOC the host city for the Olympic Games. To ensure fairness in the site-selection process, IOC members must make their selection with undivided loyalty to the IOC free from commercial influence. IOC members appear subject to the control of the IOC at least to the extent they operate under certain express standards of conduct designed to promote fairness, and may be expelled from the "organization" for failure to

---

[23] For instance, in Thatcher v. Peterson, 437 P.2d 213, 214 (Utah 1968), the Utah Supreme Court acknowledged that although membership in a religious fraternity did not in itself establish a fiduciary relationship among the members, evidence could "show such a situation did in fact exist."

42

adhere to these standards. The indictment's allegations are sufficient to withstand Defendants' argument, which best awaits the Government's trial evidence. We simply cannot conclude as a matter of law that the relationship between the IOC and its members places Defendants' conduct outside § 76-6-508(1)(a). Rather, we view the question of a principal-agent/fiduciary relationship between the IOC and its members as one of fact which the Government must establish and against which Defendants may defend. Consequently, we will not deprive the Government the opportunity to meet its burden of establishing the requisite relationship between the IOC and its members which § 76-6-508(1)(a), and thus the Travel Act, requires.

B.

Having concluded Utah Code Ann. § 76-6-508(1)(a) is a valid predicate for the Travel Act violations alleged in Counts II through V of the indictment, we now turn to the district court's decision to dismiss Counts VI through XV of the indictment, i.e., the mail and wire fraud counts. Because we have upheld the sufficiency of the Travel Act counts, we need not address the district court's holding that the mail and wire fraud counts cannot be segregated from the Travel Act counts without improperly amending the grand jury's indictment in violation of the Fifth Amendment. See United States v. Cusumano, 83 F.3d 1247, 1250-51 (10th Cir. 1996) (en banc) (exercising judicial restraint in constitutional adjudication). Instead, we focus on Defendants' claim, rejected by the district court, that the mail and wire fraud counts fall of

their own weight.

The elements of federal mail fraud as defined in 18 U.S.C. § 1341 are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme. See United States v. Haber, 251 F.3d 881, 887 (10th Cir. 2001). The first and second elements of federal mail and wire fraud are identical.[24] The third element of wire fraud as defined in 18 U.S.C. § 1343 is the use of interstate wire or radio communications to execute the scheme. See United States v. Smith, 133 F.3d 737, 742 (10th Cir. 1997). One may "defraud" another within the meaning of §§ 1341 and 1343 by depriving another of property or "the intangible right of honest services." 18 U.S.C. § 1346. Whether alleging a deprivation of property or honest services or both, a mail or wire fraud indictment must allege a scheme to defraud, an intent to defraud, and use of mail or wire. See United States v. Vinyard, 266 F.3d 320, 326 (4th Cir. 2001).

1.

In this case, the mail and wire fraud counts set forth the required elements

---

[24] The second phrase in the first element of §§ 1341 and 1343 relating to a scheme or artifice "for obtaining property . . ." modifies the first phrase addressing a "scheme or artifice to defraud" by "making it unmistakable that the statute[s] reach[] false promises and misrepresentations as to the future as well as other frauds involving money or property." Cleveland v. United States, 531 U.S. 12, 26 (2000) (internal quotations and brackets omitted).

44

in the language of the statutes. In addition, each count independently sets forth an alleged interstate or international mailing or wire transfer designed to further the scheme. See supra nn.6 and 7. Thus, the mail and wire fraud counts, like the Travel Act counts, are sufficient in that they set forth the elements of the offenses charged, and provide Defendants fair notice of the charges against them. See Avery, 295 F.3d at 1174; see also United States v. Akers, 215 F.3d 1089, 1101 (10th Cir. 2000) (generally an indictment which sets forth the elements of the crime by tracking the language of the statute is sufficient). Defendants insist, however, that the indictment fails "to include . . . essential allegations regarding the intent necessary to state a violation of the mail and wire fraud statutes." We disagree.

a.

First, Defendants argue the mail and wire fraud counts fail to allege they intended to inflict economic harm on or injure the SLBC's property rights. Although the indictment alleges Defendants' conduct subjected the SLBC "to the foreseeable risk of economic harm," we have found no case which requires such an allegation. An intent to inflict economic harm on or injure the property rights of another is not an element of federal mail or wire fraud. "The gist of the offense[s] is a scheme to defraud and the use of interstate communications to further that scheme." United States v. O'Malley, 535 F.2d 589, 592 (10th Cir. 1976).

45

The notion of harm in a mail or wire fraud prosecution is important only in the sense that proof of contemplated or actual harm to the victim or others is one means of establishing the necessary intent to defraud. See, e.g., United States v. Cochran, 109 F.3d 660, 665 (10th Cir. 1997) (acknowledging "that where actual harm exists as a natural and probable result of a scheme, fraudulent intent may be inferred"); United States v. Bowen, 946 F.2d 734, 737 (10th Cir. 1991) (noting that proof of loss may bear on the question of intent to defraud); see also United States v. Fernandez, 282 F.3d 500, 507 (7th Cir. 2002) (Government need not establish a "'contemplated harm to a victim'" to establish fraudulent intent); United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."). Because direct proof of fraudulent intent often is unavailable, courts have long permitted fact finders to rely on a variety of circumstantial evidence, including evidence of actual or contemplated harm, to infer such intent. In recognizing that a defendant's reckless indifference to the truth of a representation may establish the intent to defraud under § 1341, we noted:

> "A variety of circumstantial evidence has been held relevant to infer fraudulent intent. Intent may be inferred from evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use."

United States v. Prows, 118 F.3d 686, 692 (10th Cir. 1997) (quoting Kathleen Flavin

46

& Kathleen Corrigan, Eleventh Survey of White Collar Crime: Mail Fraud and Wire

Fraud, 33 Am. Crim. L. Rev. 861, 869-70 (1996)).  Thus, the intent necessary to a

mail or wire fraud conviction is not the intent to harm.

Rather, the intent to defraud under §§ 1341 and 1343 is akin to the intent

to deceive in order to deprive one of property or honest services.  See United States v.

Hollis, 971 F.2d 1441, 1452-53 (10th Cir. 1992) (refusing to equate an intent to defraud

with an intent to cause "financial" harm).  In United States v. Neder, 527 U.S. 1 (1999),

the Supreme Court recognized a presumption that "Congress intended to incorporate

the common-law meaning of the term 'fraud' in the mail fraud, wire fraud, and bank

fraud statutes."  Id. at 23 n.7[25]; see also Scheidler v. National Org. for Women, 123

S. Ct. 1057, 1064 (2003) (recognizing the presumption, absent proof of contrary intent,

that a statutory term adopts its common-law meaning).  Subsequently, the First Circuit

in a unanimous en banc opinion carefully analyzed the common-law meaning of fraud

in examining the intent element of a 'scheme or artifice to defraud' as used in 18 U.S.C.

§ 1344(1), the bank fraud statute.  United States v. Kenrick, 221 F.3d 19, 28-29 (1st Cir.

---

[25]  Citing United States v. Stewart, 872 F.2d 957, 960 (10th Cir. 1989), Neder
also recognized that–
> the fraud statutes did not incorporate all the elements of common-law fraud.
> The common-law requirements of "justifiable reliance" and "damages," for
> example, plainly have no place in the federal fraud statutes.  By prohibiting
> the "scheme to defraud," rather than the completed fraud, the elements
> of reliance and damage would clearly be inconsistent with the statutes
> Congress enacted.

527 U.S. at 24-25 (emphasis in original) (internal citations omitted).

2000) (en banc); see also Akers, 215 F.3d at 1102 (noting § 1344 was modeled after the mail and wire fraud statutes in which Congress intended to reach a wide variety of fraudulent activity). Relying on a host of authorities, the First Circuit concluded: "Common-law fraud . . . requires an intent to induce action [or inaction] by [one] in reliance on [another's] misrepresentation. . . . [C]ommon-law fraud has no additional 'intent to harm' requirement." Kenrick, 221 F.3d at 28.

The common-law element of intent to induce action or inaction by one in reliance on another's deceit or misrepresentation (actual reliance is not required) translates not only into the bank fraud context but also into the mail and wire fraud context. See id. A fact-finder may infer an intent to defraud where a defendant intends to deprive another of its money, other property, or right to honest services through deceit or misrepresentation. See id. at 28-29. Consistent with this conclusion, the Supreme Court has recognized "the words 'to defraud' . . . usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." McNally v. United States, 483 U.S. 350, 358 (1987), superceded by 18 U.S.C. § 1346 (internal quotations omitted). Similarly, we have recognized a "scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." Cochran, 109 F.3d at 664-65 (internal quotations omitted) (noting that "deceitful concealment of material facts may constitute actual fraud"). Accordingly, we reject Defendants' argument that the intent to cause economic harm or injury is an element of §§ 1341

and 1343. The required intent is simply an intent to defraud which the Government may establish by various means.

b.

We likewise reject Defendants' argument that the mail and wire fraud counts must allege an intent to achieve personal gain. Such intent, like the intent to harm, is not an element of the mail or wire fraud statute. See Vinyard, 266 F.3d at 326. Like proof of harm, proof of potential, actual, or contemplated gain simply is one means of establishing the necessary intent to defraud. A scheme where the accused intends to gain property, including money, at the expense of a victim is within the purview of the mail and wire fraud statutes. See United States v. Simpson, 950 F.2d 1519, 1523 (10th Cir. 1991) (wire fraud); United States v. Stewart, 872 F.2d 957, 690 (10th Cir. 1989) (mail fraud). Yet, the intent to defraud does not depend upon the intent to gain, but rather, on the intent to deprive. As the Second Circuit succinctly stated: "[T]he only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services." Rybicki, 287 F.2d at 262.

Defendants rely on the Seventh Circuit's split panel decision in United States v. Bloom, 149 F.3d 649 (7th Cir. 1998) (Bauer, J., dissenting) to suggest otherwise. Concerned with the unwarranted expansion of honest services fraud in the private sector, the court held "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal

gain." Id. at 656-57. Because the relevant count of the indictment did not allege the defendant sought personal gain from his actions, the court concluded it failed to "state an offense under the intangible rights theory." Id. at 657.

Notably, Bloom addressed only the intangible rights theory of fraud under 18 U.S.C. § 1346. No appellate court to our knowledge has ever held an intent to achieve personal gain is an element of a traditional mail or wire fraud charge involving the deprivation of property. See United States v. Stockheimer, 157 F.3d 1082, 1087 (7th Cir. 1998) (post-Bloom mail fraud decision recognizing "[a]n intent to defraud does not turn on personal gain."). Bloom's rationale is inapplicable to the Government's allegation that Defendants sought to deprive the SLBC of property.

And we are unwilling to become the first court to embrace Bloom's pleading requirements in the context of honest services fraud. Defendants urge us to judicially legislate by adding an element to honest services fraud which the text and structure of the fraud statutes do not justify. To do so would effectively endorse the proposition inherent in Defendants' (and Bloom's) argument that depriving a victim of the intangible right to honest services, no matter how significant the foreseeable harm to the victim or others might be, never constitutes honest services fraud in the absence of the perpetrator's personal gain. See, e.g., Vinyard, 266 F.3d at 326-329 (construing § 1346 to require proof (not an allegation) of "reasonably foreseeable" harm, actual or potential). Thus, at the very least, Bloom's approach is under-inclusive. See United States v. Panarella,

50

277 F.3d 678, 91-93 (3d Cir. 2002) (discussing "several problems with Bloom's definition of honest services fraud, including under-inclusiveness).

The right to honest services is not violated by every breach of contract, breach of duty, conflict of interest, or misstatement made in the course of dealing. See Cochran 109 F.3d at 667 (Section 1346 "must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent and a showing of materiality."). But at this stage we need not define the exact contours of honest services fraud or the proof necessary to sustain it. See Rybicki, 287 F.3d at 264-66 (discussing court decisions that have construed § 1346 in a manner curtailing its otherwise "limitless" reach). That the indictment alleges Defendants had an intent to deprive the SLBC of "the right of honest services" is sufficient to satisfy the intent element. To require an allegation of intent to personally gain would suggest Defendants were justified in using whatever means necessary to achieve the SLBC's goals regardless of whether those means exposed the SLBC or its competitors to harm or loss.

2.

Lastly, Defendants challenge the Government's basis for the mail and wire fraud counts. Those counts allege Defendants–

> devised and intended to devise a scheme and artifice to defraud the [SLBC] and to obtain [its] money and property by means of material false and fraudulent pretenses, representations, and promises, and to deprive the [SLBC] of [its] intangible right to the honest services of the defendants and others.

51

The Government indicates the mail and wire fraud charges are predicated on three alternative theories, namely that Defendants "contrived a scheme to defraud the SLBC (1) of actual property, (2) of its right to control how its property was used and (3) of its right to defendants' honest services." Defendants argue that none of the Government's theories are viable. At this preliminary stage, i.e., subject to proof at trial, we conclude all three theories remain viable.[26]

a.

Defendants first assert that "because the [SLBC's] funds were spent for the purpose for which they were intended–to get the Games–the [SLBC] was not deprived of money or property." To the contrary, Defendants, regardless of the end result, deprived the SLBC of its funds at the time Defendants allegedly obtained them for use under fraudulent pretenses. In other words, Defendants deprived the SLBC of property if their fraudulent conduct caused the SLBC to permit the use of its funds in a manner which the SLBC, if cognizant of the truth, would not have sanctioned.

Just as a borrower still commits bank fraud if he knowingly provides or withholds from a bank materially false information to induce a loan and then repays it, see Hollis, 971 F.2d at 1452-53, one still may commit mail or wire fraud if he knowingly provides

_____

[26] Even if one or two of the Government's three fraud theories were insufficient to state an offense against Defendants, that would not necessarily render the mail and wire fraud counts themselves insufficient so long as one theory remains viable. See, e.g., O'Leary v. United States, 856 F.2d 1142, 1143 (8th Cir. 1988).

or withholds materially false information which imposes a substantial risk of loss on another (in this case for example, the SLBC's possible loss of donors, tax-exempt status, or even the Games) even if the risk does not materialize. See United States v. Catalfo, 64 F.3d 1070, 1077 (7th Cir. 1995). Fraudulent deprivation of another's property is no less fraudulent because it might or does result in a benefit to the defrauded. See United States v. Consentino, 869 F.2d 301, 307 (7th Cir. 1989). Defendants' alleged conduct in this case could have just as easily ended in catastrophe for the SLBC.

b.

Defendants next assert that after Cleveland v. United States, 531 U.S. 12 (2000), the theory they deprived the SLBC of the right to control how its monies were used is no longer available to the Government. Cleveland held that because state and municipal licenses "do not rank as 'property,' for purposes of § 1341, in the hands of the official licensor[,]" a fraudulent scheme to obtain such licenses is not within the purview of the mail fraud statute. Id. at 15. The Court explained: "It does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." Id.

The difference between Cleveland and this case is readily apparent. Here, the SLBC's monies constituted "property in the hands of the victim." The Supreme Court recognized long ago that property defined in the "ordinary, everyday sense[]" is not only the tangible "thing which is the subject of ownership," but also "the owner's [intangible]

53

right to control and dispose of that thing." Crane v Commissioner, 331 U.S. 1, 6 (1947);

cf. Connecticut v. Doehr, 501 U.S. 1, 11 (1991) (noting the intangible "property interests

that attachment affects are significant"). Consistent with this view, we have recognized

the intangible right to control one's property is a property interest within the purview of

the mail and wire fraud statutes. See Simpson, 950 F.2d at 1523 (approving wire fraud

convictions predicated on a scheme to defraud an organization of its right to control how

its assets were used). Our sister circuits agree. See, e.g., Catalfo, 64 F.3d at 1077;

United States v. Walker, 191 F.3d 326, 335 (2d Cir. 1999); United States v. Hawkey,

148 F.3d 920, 924 n.6 (8th Cir. 1998); United States v. Fagan, 821 F.2d 1002,

1011 n.6 (5th Cir. 1987).[27]

c.

Lastly, Defendants assert § 1346 does not apply to honest services fraud in the

---

[27] In Scheidler, the Supreme Court held abortion opponents seeking to "shut down" abortion clinics did not commit extortion within the meaning of the Hobbs Act, 18 U.S.C. § 1951, because they did not "obtain" property as required by the Act. See id. § 1951(b)(2) (defining "extortion" as used in subsection (a) as "the obtaining of property from another"). The Court assumed without deciding the opponents "deprived or sought to deprive [complainants] of their alleged property right of exclusive control of their business assets[.]" Scheidler, 123 S. Ct. at 1066. But because the opponents "neither pursued nor received 'something of value from' [complainants] that they could exercise, transfer, or sell[,]" the Court held they did not "obtain" property within the meaning of the Hobbs Act. Id. That holding rendered "insufficient the other bases or predicate acts of racketeering supporting the jury's conclusion that [the opponents] violated RICO." Id at 1062. In contrast to the Hobbs Act, neither the mail nor wire fraud statute requires that a defendant "obtain" property before violating the statute. Thus, Scheidler is readily distinguishable from the present case.

54

private sector. Defendants are mistaken. Although judicial construction has limited

§ 1346's application in the private sector to curb over-criminalization, see Vinyard,

266 F.3d at 326-329 (discussing cases), our sister circuits have consistently applied

§ 1346 in private commercial settings. See United States v. Caldwell, 302 F.3d 399,

408-09 (5th Cir. 2002); United States v. Martin, 228 F.3d 1, 17 (1st Cir. 2000); United

States v. deVegter, 198 F.3d 1324, 1327-28 (11th Cir. 1999); United States v. Pennington,

168 F.3d 1060, 1064 (8th Cir. 1999); United States v. Sun-Diamond, 138 F.3d 961,

973 (D.C. Cir. 1998); United States v. Frost, 125 F.3d 346, 365-66 (6th Cir. 1997).[28]

We join them and hold the indictment's mail and wire fraud counts state an action

against Defendants for honest services fraud.[29]

IV.

The judgment of the district court dismissing the indictment is REVERSED.

Because all substantive counts of the indictment are sufficient, the conspiracy count

---

[28] Our only encounter with § 1346 to date came in Cochran, 109 F.3d at 667-69. In Cochran, we assumed without deciding that § 1346 applied "where a private actor or quasi-private actor is deprived of honest services in the context of a commercial transaction[.]" Id. at 667.

[29] We reject Defendants' suggestion that § 1346 is unconstitutionally vague as applied in this case. Courts have routinely rejected vagueness challenges to § 1346 in cases involving schemes in which defendants breached a duty owed by an agent to a principal, and so do we. See Rybicki, 287 F.3d at 263 (listing cases); compare United States v. Handakas, 286 F.3d 92, 112 (2d Cir. 2002) (holding the phrase "honest services" was unconstitutionally vague in the context of a bid contractor working for a state school authority who willfully breached a contract requirement that he pay the prevailing wage to his employees).

is sufficient as well.  This cause is REMANDED to the district court for further proceedings not inconsistent with this opinion.

SO ORDERED.[30]

---

[30]  Defendants' "Motion to Dismiss the United States' Appeal" based upon the Government's presentation of evidence outside the district court record is DENIED. In its reply brief, the Government briefly summarized evidence it intends to present at trial to demonstrate the criminal nature of payments and other benefits Defendants allegedly conferred upon IOC members.  The Government asserts this was necessary to rebut Defendants' argument that any benefits conferred were simply good will gifts and gestures.  We need not decide whether the Government's reply summary constituted proper rebuttal.  Because we did not rely on it to uphold the sufficiency of the indictment, Defendants suffered no prejudice therefrom.  Accordingly, any violation of procedural rules was harmless.