**UNITED STATES of America, Plaintiff,**

v.

**Jerome M. WENGER Defendant.**

**No. 2:99CR260PGC.**

United States District Court, D. Utah, Central Division.

Nov. 14, 2003.

Jerome H. Mooney, Esq., Mooney Law Firm, Salt Lake City, UT, Vincent Verdiramo, Esq., Verdiramo & Verdiramo, Jersey City, NJ, John H. Weston, Esq., Weston, Garrou & Dewitt, Los Angeles, CA, for defendant.

Stewart C. Walz, Esq., Assistant United States Attorney, Salt Lake City, UT, Leslie Hendrickson Hughes, Esq., Securities & Exchange Commission, Denver, CO, for plaintiff.

## MEMORANDUM OPINION FINDING SECTION 17(B) OF THE SECURITIES ACT COMPLIES WITH THE FIRST AMENDMENT

CASSELL, District Judge.

This matter is before the court on the defendant's motion to dismiss counts 1 and 2 of the indictment against him. On May 26, 1999, defendant, Jerome M. Wenger, was indicted in a three-count indictment for his role in promoting the sale of stock in a publicly-traded company, Panworld Minerals. Counts 1 and 2 of the indictment alleged that Wenger promoted the stock in a newsletter and on radio programs without disclosing the fact that he had been given millions of shares of the stock, in violation of the disclosure requirements of section 17(b) of the Securities Act of 1933.[1] Count 3 alleged that Wenger

---

1. 15 U.S.C. § 77q(b) and 15 U.S.C. § 77x.

committed securities fraud in violation of another provision of the Act[2] by recommending that investors purchase the stock while at the same time he was selling the stock.

Before trial, Wenger filed a motion to dismiss counts 1 and 2 of the indictment. Wenger's motion contended that the disclosure requirement of section 17(b) violated the First Amendment. Section 17(b) requires those who promote stock to describe the consideration that they have received for that promotion. Wenger contended that this requirement is facially unconstitutional because it constitutes inappropriate government-compelled speech. Wenger further argued that the disclosure requirement is unconstitutionally vague and overbroad.

The court heard oral argument on this matter on July 23, 2003, and issued a brief order denying the motion. The court promised a more detailed opinion after trial. From August 19–26, 2003, the matter was tried to a jury. They returned a verdict of guilty on all three counts.

In the wake of the jury verdict of guilty on all three counts—including count 3 alleging securities fraud—Wenger's challenges to counts 1 and 2 become less salient. So far as the court can determine, even if counts 1 and 2 were set aside, the sentencing guidelines calculations would be the same and the possible punishments would not be affected. For the sake of a complete record, however, the court has written this opinion explaining why Wenger's challenges to the statute are not well-founded.

Section 17(b) complies with the First Amendment. The statute regulates only commercial speech and, therefore, is not subject to strict scrutiny. Instead, disclosure requirements in the commercial speech context need only be "reasonably related to the State's interest in preventing deception of consumers."[3] Because requiring those who tout securities to disclose their compensation is reasonably related to the government's strong interest in preventing deception of investors, section 17(b) does not run afoul of the First Amendment. Nor does the statute, on these facts, suffer from vagueness or overbreadth defects. Accordingly, the court DENIES Wenger's motion to dismiss.

### Background

Wenger challenges the sufficiency of an indictment for failure to state an offense, and therefore this court is generally bound by the factual allegations contained within the four corners of the indictment.[4] After the filing of the motion to dismiss based on First Amendment grounds, the court asked the parties to provide the court with copies of the newsletters and transcripts of the radio shows that were the subject of the indictment. Neither party objected to the court's request. Because the content of the newsletters and the transcripts was undisputed, and neither party objected to the court's review of this information, this court can consider this evidence that was—at least arguably—outside of the "four corners of the indictment."[5]

Proceeding on that basis, Wenger, published a newsletter known as *The Next SUPERStock*. *The Next SUPERStock* made investment recommendations to potential purchasers of very low priced stocks. Panworld Minerals International,

---

**2.** 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; and 15 U.S.C. § 78ff.

**3.** *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

**4.** *United States v. Welch,* 327 F.3d 1081, 1090 (10th Cir.2003)(citing *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994)).

**5.** *See Welch,* 327 F.3d at 1090 fn. 11 (citing *Hall* 20 F.3d at 1087).

Inc. ("Panworld"), a publicly-traded company headquartered in Salt Lake City, Utah, was one of Mr. Wenger's recommended stocks.

During the summer of 1994, Wenger publicized Panworld stock. In *The Next SUPERStock*, Wenger gushed, "... this development stage company is making significant progress on two distinct types of mining operations."[6] He further stated, "Panworld ... plans to follow a systematic, strategic plan designed to move the company out of development and into full and dynamic profitability."[7] Wenger concluded the article with a recommendation, "[w]e believe there are several sound reasons for investors to consider an acquisition of PWLM [Panworld] at this time: The company is well-diversified .... The fact that PWLM was one of the first companies to recognize Peru as a viable mining area .... While PWLM's move out of the development and into profitability may take several months, the financial rewards should be substantial—for the company and investors alike."[8]

Similarly, on June 18, 1994, Wenger touted Panworld on a radio show in a discussion with David Hesterman, another consultant to Panworld. Wenger commented, "... Panworld, of course, is a, one of the[ir] stocks [is] trading at book value and has a great direction to go, and that's north. I think we'll start to see a little bit more of that as more people get involved in your company."[9]

Wenger also participated in a radio show with Bob Weeks. Wenger describes being "impressed" with Panworld four different times during the show.[10]

According to the indictment, and unbeknownst to Wenger's audience, Wenger was lavishly compensated for these favorable reports. Prior to the newsletters and radio shows, Wenger contracted with Panworld to provide financial public relations, consulting, and advisory services. In exchange for his services, Mr. Wenger was to receive as many as 5,500,000 shares of PanWorld stock. Between February 10, 1994, and April 15, 1994, Panworld in fact issued 3,100,000 shares to Wenger. Shortly after these communications indicating the audience should buy Panworld stock, Wenger sold portions of his shares.

During the interviews, Wenger did not disclose he owned any shares of Panworld stock. Instead, he only briefly acknowledged that Panworld used him as a "consultant." Similarly, in his newsletter, Wenger made only the following boilerplate disclosure:

> Officers, directors, editors, writers, or employees of *The Next SUPERStock* may from time to time purchase, sell or have a position in securities of the company discussed in this report, and these positions may be increased or decreased in the future. In some cases, *The Next SUPERStock* or its employees may have a consulting arrangement with some of the companies and may provide a host of services for a fee.

Wenger did not move to dismiss the indictment based on the sufficiency of these disclosures.

On May 26, 1999, the government obtained a three-count indictment against Wenger in the District of Utah. Counts 1 and 2 alleged Wenger described the Pan-

---

6. *The Next SUPERStock, Tomorrow's Blue Chip Stock,* Volume 14, Number 5, p. 1.

7. *Id.*

8. *Id.* p. 2.

9. June 18, 1994, Radio Discussion between Jerry Wenger (Host) and David Hesterman.

10. Radio Discussion between Jerry Wenger and Bob Weeks.

world stock for consideration of 5,500,00 shares, without disclosing receipt—or future receipt—of the consideration. Count 3 alleged Wenger omitted material facts when making statements about Panworld stock that operated as a fraud in connection with the purchase or sale of Panworld stock.

Wenger was also indicted, prior to the Utah case, in the Southern District of New York in April 1998, for a similar scheme involving a company named Transco which he had been touting on his radio show "The Next SUPERStock."

In 2001, Wenger was again indicted, this time in the Southern District of Florida for a similar scheme involving Omnigene Diagnostics, Inc. According to the Florida indictment, Wenger agreed to promote Omnigene stock on his radio show in exchange for 66,000 shares of Omnigene. Wenger agreed to a Rule 20 transfer of these two indictments to the District of Utah for a single consolidated guilty plea. Arrangements were made and these indictments were, in fact, all transferred to the District of Utah pursuant to Rule 20 of the Federal Rules of Criminal Procedure, a process that took considerable time. In addition to the transfer, Wenger obtained over two years of continuances and delays in consummating the guilty plea he had indicated he would enter. Finally, in March 2003, he ultimately refused to enter a plea. Instead, he requested a trial on all charges. The two matters originating outside Utah were returned to their originating courts and this matter was set for trial on August 19, 2003.

### Discussion

Wenger's motion challenges counts 1 and 2 of the indictment against him, raising First Amendment challenges to section 17(b) of Securities Act. Section 17(b) provides:

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, or such consideration and the amount thereof.[11]

Wenger argues that section 17(b)'s requirement that he "fully disclos[e]" the consideration that he had received for promoting a stock violates the First Amendment. The court finds this attack on a cornerstone of the Securities Act to be without merit.

### I. Section 17(b) Does Not Violate the First Amendment Because It is a Reasonable Mandated Disclosure in the Commercial Speech Area.

#### A. Section 17(b) Regulates Commercial Speech.

■ The threshold issue that the court must resolve is whether section 17(b) is a regulation of "commercial speech" and therefore subject to a more deferential standard of review. At first blush, the resolution of this definitional question would seem simple: paid promotional speech about purchasing stocks would seem to be quintessential commercial speech. The issue, however, is complicated by the differing definitions of commercial speech.

---

**11.** 15 U.S.C. § 77q(b).

The government's analysis of this point initially relies upon the Supreme Court's 1980 decision in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*.[12] *Central Hudson* defined commercial speech as, first, "expression related solely to the economic interests of the speaker and its audience,"[13] or, second, speech "proposing a commercial transaction."[14] The government elaborates that the Court has distinguished commercial speech from, for example, charitable solicitation, because "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services . . . ."[15] The government finally notes that, in holding that the labeling on Coors beer did not receive full First Amendment protection, the Tenth Circuit stated that "[a]dvertising has been recognized as commercial speech."[16] Since Wenger's speech was essentially advertising regarding private economic decisions, the government concludes, it is commercial speech.

The government, however, skips over some very difficult issues. For starters, it is not the case that all advertisements are commercial speech. To be sure, advertisements often will be commercial speech—as demonstrated by recent cases applying the doctrine (without any need for extended analysis) to advertisements for pharmaceutical products,[17] casinos,[18] liquor advertising,[19] and legal services.[20] And, the Tenth Circuit has recently suggested that "commercial speech is best understood as speech that merely advertises a product or service for business purposes."[21] But these decisions are best understood as indicating that advertising *can* be commercial speech—not that advertising automatically *is* commercial speech. Any other conclusion would "run up against *New York Times Co. v. Sullivan* and *Buckley v. Valeo*," which gave full first amendment protection to advertisements regarding issues of public controversy and political campaigns respectively.[22]

Nor can it simply be the case that because Mr. Wenger's program and newsletter discussed economic transactions—the sale of securities—they were commercial speech. As the government appears to

---

12. *See* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

13. *Id.* at 560, 100 S.Ct. 2343.

14. *Id.* at 560, 100 S.Ct. 2343.

15. *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

16. *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1546 (10th Cir.1991).

17. *See Thompson v. Western States Medical Center*, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002).

18. *See Greater New Orleans Broadcasting Association v. U.S.*, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).

19. *See Utah Licensed Beverage Association v. Leavitt*, 256 F.3d 1061 (10th Cir.2001).

20. *See Revo v. Disciplinary Board of the Supreme Court for the State of New Mexico*, 106 F.3d 929 (10th Cir.1997).

21. *Cardtoons, L.C. v. Major League Baseball Players Asso.*, 95 F.3d 959, 969 (10th Cir.1996)(citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 495–498, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (plurality opinion) (outlining a brief history of commercial speech that is, essentially, a history of advertising)).

22. Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 VA. L. REV. 627, 638 (1990) (discussing *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

concede, at least some discussion of the nation's securities markets clearly qualifies for full First Amendment protection. As an obvious example, the television programs on CNN, CNBC, and elsewhere— such as *The Lou Dobbs Financial Report*—would appear to be entitled to the full protection of the First Amendment. Yet the definition of "commercial speech" proposed by the government would seemingly swallow these broadcasts. The programs, one could readily argue, do no more than inform individual economic decisions and are concerned with providing information about the characteristics of securities.

To be fair to the government, its difficulties ultimately stem from varying Supreme Court definitions of commercial speech. There appears to be considerable consensus among the academic commentators that the definition of commercial speech "cannot be reduced to any simple rule or determinate criteria."[23] Indeed, some commentators have called for the abolition of the entire commercial speech doctrine precisely because it requires a distinction that "must often be applied arbitrarily in all but the easiest cases."[24] Supreme Court Justices have even asserted that they "doubt whether it is even possible to draw a coherent distinction between commercial and noncommercial speech."[25]

Yet the issue for the trial court in this case is not academic discussion of how to reform the doctrine, but rather how to apply it to the case at hand.

Application of the doctrine here can begin with the Supreme Court's admonition that the commercial speech doctrine requires courts to make "commonsense" distinctions about various kinds of speech.[26] Commonsense suggests that there is a significant difference between disinterested analysis of the nation's stock markets and compensated promotion of particular stocks. This distinction finds support in the case law. In *Lowe v. Securities and Exchange Commission*,[27] the Supreme Court suggested that "nonpersonalized investment advice and commentary" would merit full protection under the First Amendment. Relying on *Bose Corp v. Consumers Union of U.S., Inc.*,[28] a defamation case involving a *Consumer Reports* product review, the Court in *Lowe* noted in dicta that because the expression of an factual opinion about a commercial product is protected by the First Amendment, "it is difficult to see why the expression of an opinion about a marketable security should not also be protected."[29] Relying on this passage, the Seventh Circuit has concluded that *independent* investment advice is not commercial speech and is subject to full First Amendment protection.[30]

**23.** Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. REV. 1, 17 (2000).

**24.** Kozinski and Banner, *supra*, 76 VA. L. REV. at 648.

**25.** *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 575, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (Thomas, J., concurring).

**26.** *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 482, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

**27.** *See* 472 U.S. 181, 183, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985).

**28.** *See* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

**29.** 472 U.S. at 210, fn. 58, 105 S.Ct. 2557.

**30.** *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 686 (7th Cir.1998) (emphasis added).

*Lowe,* however, also contains a passage that is even more germane to the issues at hand. In discussing regulations contained in the Investment Advisors Act of 1940,[31] the Court noted that the Act distinguished between bona fide publishers versus "hit and run tipsters" and "touts." [32] The court went on to note that, "[p]resumably a 'bona fide' publication would be genuine in the sense that it would contain disinterested commentary and analysis as opposed to promotional material disseminated by a 'tout.' " [33] In finding that the publications at issue were, indeed, a bona fide publication, the Court took pains to note "there is no suggestion that they 'were designed to tout any security in which petitioners had an interest.' " [34]

Here, the government's indictment plainly alleged that Wenger was nothing more than a paid tout. As charged in the indictment—and proven to the satisfaction of the jury at trial—Wenger specifically contracted to receive over 5 million shares of Panworld in exchange for his publicizing the company on his radio show and in his newsletters. Repeatedly, throughout the summer of 1994, according to the indictment, Wenger touted the benefits of buying Panworld, and never disclosed his interest in the company.

In an attempt to distance himself from the facts surrounding his particular promotional activities, Wenger contends that Section 17(b) extends to speech that is non-commercial. He never gives an example of clearly non-commercial speech in his own activities, for reasons that are easy to understand: the statute—by definition—

reaches only paid touts. Promoting a security "for consideration received," in the language of the statute, is never anything other than serving as a tout. *The Lou Dobbs Financial Report,* on the other hand, does not promote securities in exchange for consideration and therefore is not commercial speech. If it did, presumably it would be subject to the requirements of the securities laws. As the Second Circuit has aptly observed: "The First Amendment generally empowers a journalist with no 'special privilege' merely for the exercise of his craft, and the securities laws require of him, no less than of others, compliance therewith in the pursuit of his financial interests." [35]

For all these reasons, the court reaches the commonsense conclusion that section 17(b) regulates commercial speech.

### B. Section 17(b) is a Commercial Disclosure Requirement that Need Only be "Reasonably Related" to Government Interests.

Generally speaking, restrictions on commercial speech are subject to "intermediate scrutiny" and analyzed under the framework set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York.*[36] This case, however, involves an even more deferential standard of review because section 17(b) does not restrict commercial speech but rather requires commercial speech—that is, requires various disclosures. As the Second Circuit has explained, "[c]ommercial dis-

---

31. 15 U.S.C. § 80b–3(c).

32. *Lowe at* 206, 105 S.Ct. 2557.

33. *Id.*

34. *Id.* at 209, 105 S.Ct. 2557.

35. *See United States v. Carpenter,* 791 F.2d 1024, 1034 (2nd Cir.1986).

36. *See* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

closure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend core First Amendment values of promoting efficient exchange of information or protecting liberty interests."[37]

Though *Central Hudson* applies to statutes that restrict commercial speech, *Zauderer v. Office of Disciplinary Counsel*[38] discusses the distinction between statutes mandating disclosures versus statutes prohibiting speech.[39] The Court noted that when reviewing mandated disclosures a more lenient standard is applied:

> ... in virtually all our commercial speech decisions to date, we have emphasized that *because disclosure requirements trench much more narrowly on an advertiser's interest* than do flat prohibitions on speech, *"warning[s] or disclaimer[s] might be appropriately required* ... in order to dissipate the possibility of consumer confusion or deception.[40]

In an effort to distinguish these cases, Wenger relies on a line of cases that hold that government regulation of combined commercial and non-commercial speech receives full constitutional protection. For example, in *Riley v. National Federation of the Blind of North Carolina*,[41] the Supreme Court struck down a state law requiring disclosure of the percentage of charitable contributions actually given to the charitable organization, as compared to those retained by the professional fundraiser. The Court concluded that the statutorily compelled speech was "inextricably intertwined with otherwise fully protected speech," and that the level of First Amendment scrutiny must depend upon "the nature of the speech taken as a whole and the effect of the compelled statement thereon."[42] In *Riley*, the alleged commercial speech—the advertisement for the charity—was inextricably intertwined with the protected noncommercial speech—the message about the charitable purposes. The court struck down the law because it *compelled* the disclosure of the percentages. The court concluded that the forced speech placed too great a restriction on the fully protected noncommercial speech.[43]

Similarly, in *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,[44] the Court, relying on *Riley*, reaffirmed that the call-by-call disclosures of percentages placed too great a burden on the telemarketer's speech, and that more benign and "narrowly tailored options" existed.[45] The Illinois statute in question mandated that telemarketers disclose the exact percentage of commission they received from any

**37.** *National Electrical Manuf. Asso. v. Sorrell*, 272 F.3d 104, 113–114 (2nd Cir.2001).

**38.** 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

**39.** *Id.* at 650, 105 S.Ct. 2265.

**40.** *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 ((emphasis added) (citing *In re R.M.J.*, 455 U.S. 191, 201, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982))).

**41.** 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

**42.** *Id.* at 796, 108 S.Ct. 2667.

**43.** *Id.* at 796–797, 108 S.Ct. 2667.

**44.** 538 U.S. 600, 123 S.Ct. at 1839, 155 L.Ed.2d 793 (2003).

**45.** *Id.*

charitable donations.[46]

Wenger cannot take advantage of the protections afforded the charitable solicitations in *Riley* and *Madigan*. Those cases do not involve purely commercial speech, but rather speech entitled to full First Amendment protection. As the Supreme Court carefully explained in *Riley*:

" ... in *Schaumburg v. Citizens for a Better Environment* ... we invalidated a local ordinance requiring charitable solicitors to use, for charitable purposes (defined to exclude funds used toward administrative expenses and the costs of conducting the solicitation), 75% of the funds solicited. We began our analysis by categorizing the type of speech at issue. The village argued that charitable solicitation is akin to a business proposition, and therefore constitutes merely commercial speech. We rejected that approach and squarely held, on the basis of considerable precedent, that charitable solicitations involve a variety of speech interests ... that are within the protection of the First Amendment," and therefore *have not been dealt with as purely commercial speech.*[47]

Here, by contrast, there was no fully protected speech in Wenger's communications. His "opinions" were bought and paid for with PanWorld stock, and were advertisements. Indeed, section 17(b) by definition can *only* involve commercial speech.

### C. Section 17(b)'s Disclosure Requirement is Reasonably Related to the Government's Interest in Preventing Deception of Investors.

■ The last question to resolve, then, is whether section 17(b) is "reasonably related to the State's interest in preventing deception of consumers."[48] Wenger does not seriously challenge that the primary purpose of section 17(b) is fraud prevention and that the governmental interest is substantial. Congress specifically intended this provision to confront the evils of the "tipster" sheet, as well as articles in newspapers or periodicals that purport to give an unbiased opinion but whose opinions in reality are "bought and paid for."[49] Wenger acknowledges that "it serves a valuable purpose for the public to know as much as possible in connection with any recommendation or discussion of securities."[50] The "substantial interest" of the investing public in knowing whether an apparently objective statement in the press concerning a security is motivated by personal stock ownership is obvious.[51]

The two Circuits that have considered this issue have upheld the constitutionality of the mandated disclosure requirements of 17(b). In *SEC v. Wall Street Publishing*,[52] the D.C. Circuit upheld the constitutionality of 17(b) under the federal government's broad powers to regulate securities. The Supreme Court subsequently rejected the concept that Congress' power to extensively regulate a particular area allows it

46. *Id.*

47. 487 U.S. at 787–788, 108 S.Ct. 2667 (emphasis added)(internal citations omitted).

48. *Zauderer*, 471 U.S. at 626, 105 S.Ct. 2265.

49. Committee on Interstate and Foreign Commerce, H.R.Rep. No. 85, 73d Cong., 1st Sess. (1933) 24.

50. Defendant's Reply Brief at 16.

51. *See, e.g., U.S. v. Amick*, 439 F.2d 351, 365 (7th Cir.1971).

52. 851 F.2d 365 (D.C.Cir.1988).

to avoid First Amendment concerns.[53] However, in *Wall Street Publishing,* the court indicated, that, in the alternative, the disclosure requirements of 17(b) could be upheld as a regulation of commercial speech. The court concluded that the 17(b) disclosures could be constitutional "even when the government has not shown that 'absent the required disclosure, [the speech would be false or deceptive] or that the disclosure requirement serves some substantial government interest other than preventing deception.' " [54]

In *U.S. v. Amick,*[55] the Seventh Circuit held that the investing public has a "substantial interest" in knowing whether a seemingly objective statement made in the media concerning a security is motivated by a "promise of payment." [56] The court found that there was no "significant abridgement of freedom of the press" in mandating a disclosure of the promise of payment.[57]

A District Court in the District of Columbia addressed the statute in *SEC v. Huttoe,*[58] and clarified that the proper test is whether there is a "rational relationship" between the substantial government interest in protecting the investing public

and the disclosures required by 17(b).[59] The court concluded that the disclosures required by 17(b) were reasonably related to the government's substantial interest in protecting the investing public, and rejected a First Amendment challenge to the statute.[60]

Further supporting the conclusion that disclosure requirements involve a substantial government interest and do not "trench" on the First Amendment are the many other securities cases, reaching back decades, in which the courts have repeatedly found that *nondisclosure* of relevant information is fraudulent or deceptive.[61] For example, in *SEC v. Capital Gains,*[62] the Supreme Court granted an injunction that forced a publisher of two investment advisory services (who was also a registered investment advisor) to make a "full and frank disclosure" of his practice of trading on the effect of his recommendations.[63] The Court noted that the Securities Act of 1933 extended the concept of fraud to include non-disclosures, because the "suppression of information material to and evaluation of the disinterestedness of investment advice 'operated as a deceit on purchasers.' " [64]

---

**53.** *See 44 Liquormart, Inc.,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).

**54.** 851 F.2d at 373 (quoting *Zauderer,* 471 U.S. at 650, 105 S.Ct. 2265).

**55.** 439 F.2d 351 (7th Cir.1971).

**56.** *Id.* at 365.

**57.** *Id.*

**58.** 1998 WL 34078092 (D.D.C.1998).

**59.** *Id.*

**60.** *Id.*

**61.** *See Archer v. SEC,* 133 F.2d 795 (8th Cir. 1943) *cert. denied* 319 U.S. 767, 63 S.Ct. 1330,

87 L.Ed. 1717, *Charles Hughes & Co. v. SEC,* 139 F.2d 434 (2nd Cir.1943) *cert. denied* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077; *Hughes v. SEC,* 174 F.2d 969 (D.C.Cir.1949); *Norris & Hirshberg v. SEC,* 177 F.2d 228 (D.C.Cir.1949), *Speed v. Transamerica Corp.,* 235 F.2d 369 (3rd Cir.1956).

**62.** 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

**63.** *Id.* at 182–83, 197, 84 S.Ct. 275.

**64.** *Id.* at 197–98, 84 S.Ct. 275 (quoting *SEC v. Torr,* 15 F.Supp. 315, 317 (S.D.N.Y.1936)).

Also supporting this conclusion are the wealth of federal and state regulatory programs which require disclosure of product or other commercial information. For example, tobacco labeling is mandated by statute,[65] as is nutritional labeling.[66] Congress has required disclosures in prescription drug advertisements[67] and of workplace hazards.[68] The Second Circuit has upheld mandatory labeling required of light bulbs to indicate if they contain mercury.[69] The Circuit approved this requirement, in the face of a First Amendment challenge, concluding that the Vermont statute requiring this disclosure was rationally related to the state's interest in eliminating mercury pollution.

These cases all support this court's conclusion that 17(b)'s requirement of disclosure of payment received for touting a particular stock is reasonably related to the government's interest in protecting investors.

## II. Section 17(b) is Not Unconstitutionally Vague

■ Wenger next contends that Section 17(b) is facially unconstitutional because it is impermissibly vague. Wenger focuses on the requirement of the statute forbidding stock promotion "without fully disclosing the receipt, whether past or prospective, or such consideration and the

amount thereof." The statute, he contends, is impermissibly vague because it does not specify the timing and method of disclosure.

A statute fails to meets due process requirements if it is so vague and standardless that it "leaves the public uncertain as to the conduct it prohibits."[70] A criminal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.[71] The Tenth Circuit has also explained that "[w]hen reviewing a statute alleged to be vague, courts must indulge a presumption that it is constitutional, and the statute must be upheld unless the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution."[72]

Because First Amendment activity is implicated by the statute, the court will generalize beyond the conduct at issue in this case.[73] Even so, the disclosure requirements of 17(b) are sufficiently specific to inform individuals how to conduct themselves within the law. Boiled down to its essence, the law requires anyone who publicizes a stock in exchange for compensation to disclose two things: (1) "the receipt" of that consideration, and (2) "the amount thereof." Neither of these con-

**65.** 15 U.S.C. § 1333.

**66.** 21 U.S.C. § 343(q)(1).

**67.** 21 C.F.R. § 202.1.

**68.** 29 C.F.R. § 1910.1200.

**69.** *See National Electrical Manufacturers Asso. v. Sorrell,* 272 F.3d 104 (2nd Cir.2001).

**70.** *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399,

402–403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)).

**71.** *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *U.S. v. Graham,* 305 F.3d 1094, 1104 (10th Cir.2002).

**72.** *United States v. Saffo,* 227 F.3d 1260, 1270 (10th Cir.2000).

**73.** *See id.* at 1269.

cepts is particularly difficult to understand and neither is so vague as to raise constitutional concerns.

With respect to Wenger's objection that the statute fails to specify the precise method of disclosure, the court fails to see any significant difficulty. Indeed, by leaving the precise method undefined, the statute gives stock promoters *greater* freedom since they could disclose in various ways. In the context of this case, for example, Wenger could have simply announced in his radio programs "I have been paid 5.5 million shares of Pan World stock in exchange for putting the company on this show." There is nothing difficult to understand, particularly for Wenger—a stock expert—about how to make such disclosures. Indeed, the Supreme Court itself has used such language in mandating that an investment advisory service provide "full and frank disclosure" of its holdings when publishing investment advice.[74]

With respect to Wenger's objection that the statute fails to specify the timing of the disclosure, the court again fails to see any real problem. The statute clearly envisions disclosure at the time that the stock is promoted. As an illustration, in this case, Wenger could simply have made the disclosure on the relevant radio program or in the relevant newsletter when discussing Pan World.

Mr. Wenger's arguments in this case bear a striking resemblance to arguments recently made to—and rejected by—the Tenth Circuit. In the Olympic bribery case, the defendants contended that a novel application of the Utah commercial brib-ery statute to them violated due process vagueness concerns. In reversing a decision of this court that had agreed with the defendants, the Tenth Circuit explained:

> The Constitution does not impose impossible standards of specificity upon legislatures. Courts should remain ever mindful that general statements of the law are not inherently incapable of giving fair and clear warning. Due process requirements are not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. Realistically, most statutes deal with the untold and unforeseen variations on factual situations and the practical necessities of discharging the business of government inevitably limit the specificity with which legislatures can spell out prohibition.[75]

Further reducing the problem of vagueness in this case is the scienter requirement in the statute. The Tenth Circuit clarified:

> "... where the punishment imposed is only for an act *knowingly done* with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning of knowledge that the act which does is a violation of the law." [76]

In this case, the jury was specifically instructed that they must find, beyond a reasonable doubt, that the defendant acted "willfully" in order to convict. The court

---

74. *SEC v. Capital Gains*, 375 U.S. 180, 182–83, 197, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

75. *Welch*, 327 F.3d at 1094.

76. *Id.* at 1096 (internal citations omitted) (emphasis added).

described the elements of the offense as follows:

First, that the defendant did describe a security, that is, the stock of PanWorld Minerals International, Inc., in any communication or publication.

Second, that the defendant used the means or instruments of transportation or communication in interstate commerce or the mails to describe such security.

Third, that the defendant received or was to receive consideration, for describing the securities of Pan World.

Fourth, the defendant did not fully disclose the receipt of any consideration, whether in the past or in the future, and the amount of the consideration.

*Fifth, the above acts were done willfully.*[77]

The Tenth Circuit has recently reminded courts that "[a] vagueness challenge to a penal statute based on insufficient notice rarely succeeds where the requisite mental state is one of purpose or specific intent."[78] This is not one of those rare instances.

### III. Wenger Cannot Raise an Overbreadth Challenge to Section 17(b) Because it Regulates Commercial Speech.

 Wenger also attempts to raise a facial overbreadth challenge to Section 17(b). In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*[79] the Supreme Court concluded that the overbreadth doctrine does not apply to commercial speech. The overbreadth doctrine is a departure from ordinary rules and allows for challenges to statutes that may apply unconstitutionally in cases not before the court.[80] In the First Amendment context, an overbreadth challenge can be used to prevent the "chilling" of free speech.[81] In restricting facial challenges to commercial speech, the Court has noted that commercial speech is "hardy" and therefore less likely to be "chilled."[82] Wenger urges this court to consider that prosecutions under section 17(b) might "chill" commercial speech. The mandates of section 17(b) have been in place for over 50 years, yet the discussion of purchase of securities in this country continues unabated. In light of this court's conclusion that the communications in question were commercial speech, Mr. Wenger's overbreadth challenge fails.

### CONCLUSION

The court DENIES Mr. Wenger's motion to dismiss Count I and II of the indictment.

77. Jury Instruction No. 20.

78. *Welch and Johnson,* 327 F.3d at 1096.

79. 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982),

80. *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

81. *See id.*

82. *See S.U.N.Y. v. Fox,* 492 U.S. 469, 481, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).